CASE 54—EQUITY—NOVEMBER 15, 1883.

## Alexander, &c., v. de Kermel, &c.

81 345<br>111 576

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. The common law doctrine of reversions prevails in Kentucky.
2. A conveyance to one for life, and then to the grantor's heirs, creates a reversion in the grantor, and, upon the death of the life-tenant, the grantor may devise the estate as he pleases.
3. There must be a delivery and an actual acceptance or assent before a deed becomes binding between the parties or valid as a deed. The mere execution of a deed, and its delivery to the county clerk, is not sufficient, unless directed by the grantee or afterwards assented to by him.

4. The acknowledgment of a deed is a fact which may be proved to show delivery, but standing alone, it does not establish a presumption of delivery.

5. Where the rights of third persons have attached, they cannot be destroyed by the subsequent acceptance and recording of a deed previously executed.

6. A mere order sustaining a demurrer not followed by a judgment dismissing the pleading, or that part of it demurred to, is not final, and may be disregarded by the court in rendering final judgment.

BULLITT & HARRIS FOR APPELLANTS.

1. The judgment of the chancellor sustaining the demurrer to the first paragraph of the petition was a final order, which might have been appealed from, and, after the expiration of sixty days, was beyond the control even of the court which rendered it. The vice chancellor had no power to vacate or modify it, even within sixty days. (Civil Code, secs. 772 and 777; Young v. Peters, 4 Bush, 403; Dudley v. Kentucky High School, 9 Bush, 576; Freeman on Judgments, sec. 267.)

2. The common law rule that where one grants an estate to another for life, with remainder to the grantor's own heirs, the remainder is void, has no application in Kentucky. It was founded upon the same considerations of feudal policy as the rule in Shelley's case, and the court having rejected one of these twin rules, will not now adopt the other. (2 Blackst. Com., 242; 2 Thomas Coke, side page 141; Ib., 142; Ib., Appendix, note 4, p. 536; Turman v. White, 14 B. M., 450; Williamson v. Williamson, 18 B. M., 369.)

3. The acknowledgment of a deed is prima facie evidence of previous delivery. (McConnell v. Brown, Litt. Select Cases, 468; Ford v. Gregory, 10 B. M., 180.)

BROWN & DAVIE FOR APPELLEES.

1. The deed of 1856 created a reversion in the grantor, not a mere remainder to his heirs. (4 Kent, 353, 354; Cruise's Digest, title xvii, sec. 4; Ib., secs. 10, 11, aliter, secs. 12, 13; Coke on Littleton, chap. 2, sec. 19, book 1, title Fee Tail; Washburn on Real Property, vol. 2, p. 388; Ib., 395.)

2. The decisions in Kentucky, and the statutes based upon them, which refuse a recognition of the rule in Shelley's case, apply to remainders alone, and do not concern or touch the common law doctrine of reversions, which is still recognized in Kentucky. (Turman v. White, 14 B. M., 450; Prescott v. Prescott, 10 B. M., 56; Gen. Stat., ch. 63, art. 1, secs. 10, 11, and 25.)

3. The theory of reversions is absolutely necessary to uphold any doctrine of remainders whatever. (Washburn on Real Property, vol. 2, p. 540.)

4. All the circumstances connected with the execution of the deed of 1864 stamp it as a voluntary family trust, under which the father took the title, to be restored to his son when the war cloud had blown over. (58 Ill., 310.)

5. There is no proof that the grantee in the deed of 1864 ever accepted it. (58 Ill., 310.)

6. An order merely sustaining a demurrer to a petition not followed by a judgment in bar or dismissal, is not final, and the court is not precluded from disregarding such an order when it come to render final judgment. (Offutt's ex'r v. Bradford, 4 Bush, 414; Birch v. Funk 2 Met., 544; Gilman v. Rivers, 10 Peters, 302; Clearwater v. Meredith, 1 Wall., 43; Aurora v. West, 7 Wall., 99; Goodrich v. The City, 5 Wall.; Freeman on Judgments, sec. 30; Newport v. Covington Bridge Co. v. Douglass, 12 Bush, 676; Civil Code, sec. 134.)

CHIEF JUSTICE HARGIS DELIVERED THE OPINION OF THE COURT.

This was an action by appellees for the construction of a deed of trust made by Thomas Bullitt Alexander in 1856, and of his will made in 1878, while in the Republic of France, at the appellees' home, whither he had gone some time after the American civil war, and where he virtually enjoyed their hospitality and kindly offices for several years preceding his death.

By the deed of 1856 he conveyed a lot and warehouse thereon to Wilson in trust for his own use during life, and to his issue, if any, in fee; if none, then in equal parts to two half brothers, or the survivor, or to the issue of either, and "if both of them should die before the party of the first part without issue, said property shall go to the heirs of the said party of the first part."

The half brothers died without issue before Thomas Bullitt Alexander, who, after their death, himself having no issue, devised by his will the house and lot to the appellee, Mrs. de Kermel.

The petition of herself and husband was not paragraphed until after appellants made a motion to compel them to para-

graph it, which they did without objection.  Thereupon, the
appellants, claiming the house and lot as heirs and devisees
of Col. T. L. Alexander, who was the father of Thomas
Bullitt Alexander, and survived him, demurred to the first
paragraph of the petition, which was sustained, but no judg-
ment was rendered effectuating the demurrer, either by dis-
missing the first paragraph or otherwise.   In this condition,
the case was transferred to the vice chancellor's court, and
there, upon the hearing on the merits, the appellees recov-
ered judgment, declaring the title to be in Mrs. de Kermel,
and removing the cloud therefrom.   From that judgment
this appeal was taken.   The first question is, whether the
order sustaining the demurrer was final and conclusive unless
reversed, the appellees having failed to appeal from that
order.

As there was no judgment following it, the mere order
sustaining the demurrer was not final and appealable.   It is
well settled that even *a judgment* on demurrer, unless the
complaint is sufficient, is no bar to a future action.   Section
267 of Freeman on Judgments has no application where
the demurrer is not followed by a judgment, or an order
equivalent to a judgment.   Although a demurrer may be
sustained, the case may be kept in court for the purpose of
amendment or reconsideration before judgment of dismis-
sion, and the court may finally determine not to dismiss the
pleading on either of those grounds.   Hence, the order
sustaining the demurrer to the first paragraph of the peti-
tion is not final or preclusive, and the subsequent judgment
of the court must be treated also as an order correcting the
error in sustaining the demurrer, which the court had the
right to make, as no former judgment had been rendered on
the demurrer.   In the first paragraph of the petition the

appellees set forth the deed of 1856 and the will, and in the second they averred, substantially, that if they were mistaken as to the proper construction of those instruments, then they were entitled to the property because of an agreement and declaration of trust on the part of the father of Thomas Bullitt Alexander to hold it for his use.

The appellants answered, controverting the material allegations of the petition as to the construction of the deed and will, and, in avoidance, pleaded a conveyance of the house and lot in May, 1864, by Thomas Bullitt Alexander to his father in consideration of $9,000, all of which is stated to have been paid in different amounts from the year 1854 to the date of the deed, except $1,000 paid at the latter date. The appellees, in effect, replied, that this deed was never delivered to or accepted by his father, and if it had been, it was in trust for Thomas Bullitt Alexander's use and benefit.

Thus, it will be seen, that the correctness of the judgment below depends upon the legal effect of the deed of 1856, and on the fact whether the deed of 1864 was delivered, and, if so, whether a maintainable resulting trust grew out of the circumstances of its execution.

We will first consider the deed of 1856. The real question under it is, whether the term "heirs," embraced in the words "said property shall go to the heirs of the said party of the first part," imports purchasers. It is undoubtedly the law that Thomas Bullitt Alexander had the right to designate his heirs as purchasers under the deed, but whether he intended to do so depends upon the terms which he employed. We must assume, in the absence of words in the deed expressing a contrary intention, that the language quoted from it was used in its legal sense, and subject to legal interpretation.

According to the elementary books, the language under consideration made such a disposition of the reversion in the property, which was not absolutely conveyed by Thomas Bullitt Alexander, as the law would have made had not the reversion been provided for or nothing been said about it.

According to Coke, "a reversion is where the residue of the estate *always* doth continue in him that made the particular estate, or where the particular estate is derived out of his estate;" and, in illustration of reversions, he says: "If a man seized of lands in fee make a feoffment in fee (and depart with his whole estate), and limit the use to his daughter for life, and after her decease to the use of his son in tail, and after to the use of the right heirs of the feoffor; in this case, albeit he departed with the whole fee-simple by the feoffment, and limited no use to himself, yet hath he a reversion." And he says further, even "if the limitation had been to the use of himself for life, and after to the use of another in tail, and after to the use of his own right heirs, the reversion of the fee had been in him, because the use of the fee continued over in him." And as a reversion is never created by deed or writing, arising only from construction of law, it would seem that the last quotation precisely embraces such a case as this, and places the estate in the grantor as a reversion by the construction which the law gives to his deed.

On page 175, second book, Blackstone, in treating of reversions, uses these words: "An estate in reversion is the residue of an estate left in the grantor, to commence in possession after the determination of some particular estate granted out by him;" and that "Sir Edward Coke describes a reversion to be the returning of land to the grantor or his heirs after the grant is over."

Blackstone attributes the doctrine of reversions to the feodal constitution; but Kent differs from him, and says that reversion, in the general sense, must be familiar to the laws of all nations who admitted of private property in lands. (4 Kent, 389.) Therefore, and from the nature and purpose of reversions, we think they are not as inimical to our allodial system of titles to lands as remainders, on which the doctrine of English entails were principally based.

There is nothing like the mischief, in saying by deed, after the termination of a life-estate or the happening of an event destructive of a defeasible fee, that the estate shall go to the heirs of the grantor, and that such heirs so designated shall not take as purchasers, as flowed from the rule in Shelly's case, undermined by decision and overturned by statute, where a grant to one person for life, and in remainder to his heirs, conferred the whole estate upon him on whom, in many instances, the grantor intended only to cast a life-estate. In such cases the heir was defeated of any present estate, though intended to be a purchaser, and the intention of the grantor subverted, and the common sense of his words ignored. Happily for the state, no such rule ever got a practical foothold here, and the legislative act by which titles ceased to be menaced by it is a strong fact in support of the continuation of the law of reversions, which were left undisturbed at a time of discussion and investigation which necessarily called attention to them. This view is supported by statutory recognition of a remedy by action in behalf of the reversioner equally with the remainderman for waste by tenant for life or years (General Statutes, chapter 66, article 3); and by the provision for the sale of the rights of reversion. (Section 25, article 1, chapter 63, *Ibid.*)

. The language of the 10th section of article 1, chapter 63, General Statutes, was strictly appropriate for the repeal of the rule known as the rule in Shelly's case, and it was adopted alone for that purpose. And it appears to us that the manifest intention of the legislature not to interfere with reversions, coupled with the fact that they are essential to prevent the abeyance or lapsing of estates where the re- mainders all fail in the life-time of the grantor, who can have no heirs while living, settles beyond controversy that the common law doctrine of reversions prevails in this state, as well as the great body of the rules relative to remainders. By the rule in Shelly's case the grantor, while parting with his estate for one purpose, was compelled to stand by and see perhaps the more valuable part of it diverted to another contrary to his most express intention. That cannot be so with reversions, for, if the grantor may have meant that his heirs should take as purchasers, but did not use language sufficiently explicit for that purpose, which would make them remaindermen instead of reversioners, the property reverting back to himself, or, more strictly speaking, the reversion becoming an estate in possession, he would be still in condition to have his estate take the course he first intended but did not express; or, as no livery is necessary under our laws, he could convey it; by deed or devise, to such as would be his heirs, and thus secure to them the property if he so desired. This view has ample foundation in the eighteenth paragraph of Washburn on Real Estate, 2d vol., ch. 8, where law relative to reversions is correctly stated in these words:

"At common law, if a man seized of an estate limited it to one for life, remainder to his right heirs, they would take, not as remaindermen, but as reversioners, and it would be,

moreover, competent for him, as being himself the reversioner, after making such a limitation, to grant away the reversion."

Neither is there any danger of entails under the law of reversion, for remainders are necessary to that end, and they cannot be created so as to suspend the absolute power of alienation for a longer period than a life or lives in being at the creation of the estate and twenty-one years and ten months thereafter. (Section 27, article 1, chapter 63, General Statutes.)

According to our view of the law found in text-books and many decisions of great value, we are convinced that the language of the deed of 1856 created a reversion in Thomas Bullitt Alexander, which is a devisable estate both at common law and by our statute on wills. (2 Washburn, 387.) And unless the deed of 1864 presents a barrier to her right, the appellee, Mrs. de Kermel, is entitled, as devisee of Thomas Bullitt Alexander, to the house and lot in controversy.

The first question is, was that deed ever delivered to Col. T. L. Alexander or accepted by him?

Thomas Bullitt Alexander, in May, 1864, being then a captain in the United States army, came to Kentucky, resigned his commission, and at Owensboro executed the deed, which was brought to Louisville by Chas. P. Rudd, and probably left by him with the clerk for record. There is no evidence that Col. T. L. Alexander ever saw the deed after its execution, and he was not present when his son signed it; nor did he delegate any one as his agent to accept it for him, so far as this record shows.

No one seems to have seen or thought of the deed until
Mrs. de Kermel set up claim, by suit, to the property under
the will of Thomas Bullitt Alexander; then it was put to
record.    It had lain in the county clerk's office from June,
1865, to June, 1881, a period of sixteen years, without
having been recorded, with an entry in the alphabetical list
of unrecorded deeds, giving the grantor, grantee, date, brief
description of the property, and " not fully proven."

About one month before Col. Alexander's death, he had
no recollection of the deed.    From the circumstances of his
son, who was on his way south to join the Confederates, it
is reasonable to infer that Col. Alexander, then an officer of
the United States army, did not have any part personally
in the preparation or handling of the deed, or in selecting
its depository.    In fact, he seems to have avoided doing so,
leaving the matter as if he knew nothing of it, giving no
one authority to accept the deed for him, and never looking
at or handling it himself.    Had he known such a deed was
executed, and had he in good faith entered into the trans-
action it purports to evidence, and parted with $1,000 in
cash down, and previously paid $8,000 as a consideration for
the property, he certainly would have caused the deed to be
recorded if it had been delivered to him or he had accepted
it.    It is true he sent his son $500 just before the deed was
signed, but that he never relied on it for title, or, in fact,
knew where it was, or its condition, is abundantly shown
from written statements made by him in letters written to
Mrs. de Kermel.    In one, dated July 19, 1880, he speaks
of the sale of *his* house, in which *he* would have to join,"
meaning Thomas Bullitt Alexander.    The latter, in a pre-
vious letter written in 1877, says: " I am perfectly willing

to give my signature if his father would like to sell and invest in something else."

These facts, without mingling them with those which stamp the whole transaction as a trust sought rather to be imposed on Col. Alexander than voluntarily accepted by him, show that the deed was neither delivered to him nor accepted by him, or by any one else for him with authority to do so. The law is clear on this point, that there must be a delivery, and an actual acceptance or assent, before the deed becomes binding between the parties, or valid as a deed. The mere execution of the deed by Thomas Bullitt Alexander, and the delivery of it to the county clerk, is no delivery unless Col. Alexander so directed it or afterwards assented to it. (Maynard v. Maynard, 10th Mass., 456; Sampson v. Thornton, 3 Met., 275; Cooper v. Jackson, 4 Wis., 537.)

There is no proof that he did either. Counsel contend, however, that it is well settled in this State, by the cases of McConnell v. Brown, Litt. Sel. Cases, 468, and Ford v. Gregory, 10 B. M., 180, that the acknowledgment of a deed is *prima facie* evidence of previous delivery. In the first of these cases, the court expressly says that an acknowledgment is merely *evidence* of the delivery, but it is not a delivery. Of course, an acknowledgment is evidence competent to be considered on the question of delivery, but this is a very different proposition from that of counsel who would give a degree of weight to that fact which it cannot support. The only presumption arising in that case is, that when *delivery* is established, it is presumed that the *time* of delivery is the date of the deed. To the same effect is the case of Ford v. Gregory, in which it is said: "The delivery of a deed is always presumed to have been made *on the day* of its date,

and its subsequent acknowledgment does not change this. presumption;" . . . "and, as the acknowledgment is only *evidence* of an antecedent delivery, and the date of the deed. is only *prima facie* evidence of the time," other evidence of the time, &c., is admissible.

The acknowledgment is a fact which may be proven to show delivery, but, standing alone, it does not establish a. presumption of delivery, and, for many good reasons, it ought not to do so. It only requires the act of the grantor to make the acknowledgment, and it would be dangerous policy to allow such weight to an act of his own as to make it *prima facie* evidence of the important fact of delivery, which requires the concurrence of the grantee.

In the case of January v. Bradford, 4 Bibb, 566, it was held that a person bound by bond to make deed could not, without the assent of the grantee, make him a deed by executing and acknowledging it before the clerk of the county court, and, for the same reason, we do not think a *prima facie* case of delivery can be made by such acts. Even where the deed is acknowledged and recorded, the denial by the grantee of delivery repels the *prima facie* presumption of acceptance. (1 Bush, 248.) In such case the act of recording, and the effect of the record itself, are matters which are not wholly in the control of the grantor; and they are very important facts, for they are generally the result of the act of the grantee, and more importance should be attached to them for that reason; but his denial even as to them abates their *prima facie* force.

In this case the deed was not fully acknowledged or put to record until after the action was brought, and these are not such facts as to authorize a legal presumption of the delivery of the deed. The grantee must assent to the de-

livery, and, according to the case of Bell v. Farmers' Bank, &c., 11 Bush, 39, the grantee must be informed of the deed, and do some act equivalent to an acceptance of it, or he may refuse to accept it.   Presumption of acceptance could not be indulged in this case even against the grantor, were he living, except through a fiction of law, that acceptance had been made by operation of law for the grantee.  But such a presumption should not be indulged against third persons who have acquired title to the property before the time of actual acceptance.   (11 Bush, 39 and 40.)

Here there was no actual acceptance before *lis mota*, and really none until *lis pendens*.   The rights of appellee, Mrs. de Kermel, had attached, and they cannot be destroyed by an afterthought, causing the record of this dormant deed made by a young man pressed, under unfortunate circumstances, to take the liberty of trusting his property to his father, by executing and placing the deed in the county clerk's office, where it lay sixteen years unrecorded, forgotten, and disregarded, unless he remembered it as he penned, at the close of his codicil, the line "I beg my father to fulfill these, my desires."

Wherefore, the judgment is affirmed.