Coney v. Laird.

CONEY, Plaintiff in Error, v. LAIRD, et al.

### Division Two, January 23, 1900.

1. **Debtor and Creditor:** PAYMENT: APPLICATION. In the absence of any directions to the contrary by the debtor who owes his creditor more than one valid and subsisting debt, the creditor has the right to apply any payment made to him by the debtor to any of the debts he may choose.

Coney v. Laird.

2. ———: ———: ———: DEED OF TRUST: SALE OF TIMBER, ETC. Where it is agreed that the money received by the mortgagor from the sale of timber on the mortgaged land is to be "paid on the indebtedness of" said mortgagor "to the estate" of which the *cestui que trust* is executor, and no other agreement is made in regard to its application, the executor has the right to apply it to the liquidation of other indebtedness due from the mortgagor to the estate.

3. **Deed of Trust:** FORECLOSURE SALE: COLLUSION. Any collusion which prevents or destroys competition, or which prevents fair and impartial bidding, will render a trustee's sale invalid. But an agreement between the holder of a second deed of trust and the *cestui que trust* of the first deed of trust, by which the former is to bid in the lands at the sale for the full amount due on the primary debt, with interest, taxes and costs, and pay in cash only the interest due, taxes and costs, and give his note or notes for the balance, secured by deed of trust on the land, and if he is the highest bidder and the lands are sold to him, this arrangement is to be carried out, is no collusion.

4. ———: ALTERATIONS. Changes in a deed of trust, such as erasing the printed word "Pettis" county and writing "Benton" county over it, if made before the deed was signed, or with the knowledge or consent of the grantor therein, are not such alterations as invalidate such deed.

5. ———: DESCRIPTION: WRONG COUNTY. If the record describes the lands by sections, townships and range, it will be held that it gives notice of the claim of the grantee, although the record states the lands are in another county than that in which they are actually situated and the deed was recorded.

6. ———: ———: ———: ESTOPPEL. One who has in a proceeding in a Federal court recognized a deed of trust as a valid and subsisting lien, and has derived benefit therefrom in his judgment against the mortgagor for the breach of his warranty deed covenanting the lands to be free of incumbrances, will not be permitted thereafter to deny the validity of such deed of trust.

Error to Benton Circuit Court.—*Hon. W. W. Wood,* Judge.

AFFIRMED.

*Wheeler & Burney, T. W. Harrison, L. H. Waters* and *Waters & Waters* for plaintiff in error.

(1) The application of payments must be made to such debts as the debtor was legally bound to pay, and not to such

as he was not legally bound to pay. Poindexter v. LaRoche, 7 Smed. & M. (Miss.) 699; Beck v. Hass, 31 Mo. App. 180. (2) The evidence shows the grossest kind of fraud and collusion, and that while it was advertised to be a public sale for cash yet in fact it was to be a private sale to Shirk, and all on time, excepting the interests, taxes and costs. Such a collusive arrangement would be a fraud upon the owner of the land, and would invalidate any sale made in pursuance thereof. Any collusion that would prevent or destroy competition would render the sale void. Any collusion that tends to destroy and prevent fair and impartial bidding will render the sale invalid. Rorer on Jud. Sales, secs. 107, 108, 109, 346, 425, 638, 1036, 1057; Michaud v. Girod, 4 How. 503; Underhill v. Courtland, 2d Johns. Chy. 252; Gilbert v. Bank, 9 Paige, 649; Cohen v. Wagner, 6 Gill (Md.) 236; Cusey v. Hardin, 2 B. Mon. 407; Altaway v. Bank, 5 S. W. Rep. 16. (3) The court erred in not rendering judgment in favor of the plaintiff declaring the deed of trust of defendant W. S. Shirk, and the claim of defendant the Third National Bank of Sedalia, Mo., and each of them, void and of no effect. (a) The change made in the description which located the lands in Pettis county to Benton county, was such a material alteration as would render the instrument void. McIntyre v. Vette, 153 Pa. St. 350; Hollinsworth v. Holbrook, 80 Ia. 151; Catler v. Rose, 35 Ia. 456; Reeves v. Pierson, 23 Hun. (N. Y.) 185. (b) A material alteration of a mortgage after delivery destroys and annuls the instrument, and destroys the lien claimed under it. 2 Am. and Eng. Ency. of Law. 189; 1 Jones on Mortgages, sec. 94; Johnson v. Moore, 33 Kan. 90; Pereau v. Frederick, 17 Neb. 117; Moells v. Sherwood, 148 U. S. 21; Marcy v. Dunlap, 5 Lans. (N. Y.) 365; Oliver v. Hawley, 5 Neb. 439. (c) And the doctrine of subrogation can not be applied to relieve the party from the effects of his own wrongful act. Sheldon on Subrogation, sec. 44; Guckenheimer v. Angevine, 81 N. Y. 394; Railroad v. Soutler, 13 Wall. 517; Johnson v. Moore, 33

Kan. 98.   (d)   Any material alteration will void the instrument, no matter how pure the motive may have been in making it.   Moore v. Hutchinson, 69 Mo. 429; German Bank v. Dunn, 62 Mo. 79; Evans v. Foreman, 60 Mo. 449; Haskell v. Champion, 30 Mo. 136; Bell v. Mahin, 69 Ia. 408; Enterprise Transit Co. v. Sheedy, 103 Pa. St. 492.   (4)   The purchaser is protected in placing complete reliance on the record.   The obligation of giving notice rests upon the party whose duty it is to give the notice.   If his duty is imperfectly performed the consequences must fall on him and not on an innocent purchaser.   Terril v. Andrew Co., 44 Mo. 309; Viele v. Judson, 82 N. Y. 32; Cook v. Travis, 22 Barb. 349; Marcey v. Dunlap, 5 Lansing, 365; Whalley v. Small, 25 Ia. 184; Transit Co. v. Sheedy, 103 Pa. St. 492; Persan v. Frederich, 17 Neb. 117; Vaughn v. Tracy, 22 Mo. 415; Hoyt v. Jones, 31 Wis. 401; Green v. Township, 37 Wis. 449; Van Thornily v. Peters, 26 Oh. St. 471; Railroad v. Pettis, 26 Oh. St. 261; Barnard v. Campau, 29 Mich. 162; Calder v. Chapman, 52 Pa. St. 359; Owens v. Northrup, 30 Wis. 482; Colomer v. Morgan, 13 La. Ann. 202.   (5)   The note described in the trust deed was for $7,000, and that note was afterwards renewed, and in equity the assertion by Shirk of a mortgage that he knew was for more than the debt, would be a fraud or an abandonment of his security.   Henderson v. Henderson, 55 Mo. 555; Wallach v. Wylie, 28 Kan. 138; Mcdonald v. Gancet, 30 Kan. 693; Tompkins v. Wheeler, 16 Peters, 118; Winstead v. Hulme, 32 Kan. 629; Horton v. Dillian, 21 Minn. 187; Russell v. Winnie, 37 N. Y. 59; Rich v. Leoy, 16 Md. 74; Burnham v. Dunn, 35 N. H. 557; Hickox v. Elliott, 27 Fed. Rep. 830.

*Wm. S. Shirk* and *Montgomery & Montgomery* for defendants in error.

(1)   The agreement between Shirk and the executors of the Reed estate was not a combination or conspiracy by which

Shirk was to be permitted to manage the sale under the deed of trust on his own terms and to "exclude the plaintiff." It was simply an arrangement by which the executors agreed that if Shirk became the highest and successful bidder at the sale they would accept from him such part of his bid as might be agreed upon in cash and would take his notes, secured by deed of trust, upon the land purchased, for the balance of his bid. Such an arrangement did not have any effect or tendency to depress or chill the sale or prevent competition or to hinder anyone from bidding. It was not inconsistent with the terms of the power to sell for cash. Mead v. McLaughlin, 42 Mo. 194; Snyder v. Railroad, 131 Mo. 578; 2 Jones on Mortg. sec. 1871; 2 Pingrey on Mortg. sec. 1382; Ballinger v. Bourland, 87 Ill. 516; Mahone v. Williams, 39 Ala. 215; Hubbard v. Jarrett, 23 Md. 75; Markey v. Langley, 92 U. S. 153; Bailey v. Ins. Co., 10 Allen, 286; Tortt v. Clayton, 109 Ill. 579; Thurlow v. Mackeson, L. R. 4 Q. B. 97; Cox v. Wheeler, 7 Paige, 248; Kennedy v. DeTrafford, 74 L. T. Rep. 599; s. c. 76 L. T. Rep. 426. (2) The agreement between Shirk and the executors was exactly such an arrangement as the plaintiff endeavored to make for himself with the executors. Failing to obtain such an agreement it does not now lie in the mouth of the plaintiff to assert that the agreement would have prevented a fair sale of the property under the deed of trust or that it gave Shirk any improper advantage over him. (3) The timber was sold to Ayers long before plaintiff acquired any interest in the land, and it was especially excepted from the conveyance made to him by Newkirk, and the purchase price had been paid and applied in discharge of Melton's indebtedness to the executors of the Reed estate in the manner agreed to by all the persons having any interest in the land at the time, and the plaintiff can not complain that the whole of the price of the timber was not credited on the notes secured by the Chapman deed of trust to the executors. Melton, with the consent of Newkirk, had a right to direct

application of the payment and having done so it can not now be disturbed.    Beck v. Haas, 111 Mo. 268; Poulson v. Collier, 18 Mo. App. 583; Goetz v. Pul, 26 Mo. App. 641.    (4)  The plaintiff asserts title to the land in controversy under the decree of the United States court, which he sets out in his pleadings and proves by the evidence.    This decree recognizes these two deeds of trust as valid and subsisting liens upon the property. The plaintiff by it is given relief as against the incumbrances created by these two deeds of trust in full recognition of their validity and he can not now be heard to deny that they are valid and subsisting liens.    Fox v. Winder, 127 Mo. 511; Austin v. Loring, 63 Mo. 23; Pomeroy's Equity (2 Ed.), sec. 395; 1 Herman on Estoppel, p. 11; 1 Jones on Mortg. secs. 736, 744 and 1491; Crawford v. Harter, 22 Mo. App. 635; Howard v. Chase, 104 Mass. 251.    (5)  There was no alteration of the Shirk deed of trust to bring it within the principle relied upon by the plaintiff.    The name of the county was changed before the deed of trust was signed and the other changes were made by the mortgagor in his own handwriting. Any changes made by the mortgagor, or with his knowledge and consent, even after execution by him, must be received in the same light as to the results consequent therefrom as though done with his own hands.    Evans v. Foreman, 60 Mo. 452. (6)  The lands are described in the Shirk deed of trust by congressional numbers, and the deed of trust states on its face that the lands thereby conveyed contain in all 9,525 acres, and were all of the lands purchased by me (Richard H. Melton, the mortgagor), of the estate of William Reed, deceased, and subject to another deed of trust given by said mortgagor to the executors of William Reed to secure the payment of two notes amounting to $12,702.28.    It is referred to and identified in every conveyance through which the plaintiff claims title.    The land is sufficiently identified and the deed of trust is a valid subsisting charge upon the land.    Howe v. Williams, 51 Mo. 252; Bradshaw v. Bradbury, 64 Mo. 334; Long v.

Wagoner, 47 Mo. 178; Welt v. Cutler, 38 Mich. 189; Devlin on Deeds, sec. 1016.

BURGESS, J.—This is an action to restrain a sale of lands under a deed of trust, and for an accounting.

A temporary injunction was granted in the case, which, upon motion of defendants after answers filed, was dissolved, and judgment rendered for defendants. Plaintiff then filed his motion for a new trial, which was overruled and he appeals.

Prior to the 20th day of November, 1889, the estate of William Reed, deceased, owned a large body of land in Benton county, containing about 9,526.81 acres. About that time the executors of said William Reed sold these lands to one Richard H. Melton, of Sedalia, for the sum of $19,053.42, of which $6,351.14 was paid in cash by said Melton, and for the balance of the purchase money he executed two notes for the sum of $6,351.14 each, payable to the order of Samuel Collins, William P. Murray and F. C. Osburn, executors of the estate of said Reed, and to secure their payment Melton and his wife executed the deed of trust on the lands sold, the sale of which under the deed of trust was enjoined in this proceeding.

Thomas C. Chapman was named as the trustee in the deed of trust. It provided that in the event of the death of the trustee or his refusal to act that the then acting sheriff of Benton county might execute the trust.

To obtain the money necessary to make the cash payment Melton went to the defendant Shirk for assistance, who agreed to help him raise the money. They then arranged with the Third National Bank of Sedalia for the money, to secure the payment of which Melton executed his note, payable to the order of Shirk, for $7,000, the note being made for a larger sum than the actual amount of money necessary for the purpose, in order to cover the payments of interests, and Shirk indorsed and delivered this note to the bank as collateral to secure their joint note, which they at that time executed and

delivered to the bank for the sum of $6,200, the amount requisite to make the payment. The note for $7,000 was secured by a second deed of trust on all the lands purchased, in which R. H. Moses was made trustee, and was recorded in the recorder's office of Benton county. It describes the lands as it appears of record as in Pettis county, as containing 9,525 acres and "are all the lands purchased by me of the estate of William Reed, deceased."

Thereafter, on the 23d of September, 1890, Melton made a warranty deed conveying these and other lands to the defendant Cyrus Newkirk. This deed was recorded in the recorder's office of Benton county on the 25th day of October, 1890. By this deed the lands thereby conveyed are described as the same lands as those bought from the Reed executors, and also conveyed by the Shirk deed of trust, and recites upon its face that the land within conveyed is subject to the incumbrances then on the same, amounting to about $23,000.

While this deed purports to be a warranty deed, it was in fact only a conveyance of the lands as security for certain indebtedness owing by Melton to Newkirk, and to the First National Bank of Sedalia.

On the 30th of March, 1892, Newkirk and Melton sold to one E. D. Ayers all of the timber suitable for ties, saw-logs and piling on about three thousand, three hundred and fifty acres of the land. The contract for the sale of the timber was also recorded in the recorder's office of Benton county. It is dated March 30, 1892, and recites that in consideration of $10,750, of which $7,000 was to be paid in cash and $3,750 in twelve months, "said sum to be paid on the indebtedness of said Melton to said Reed estate, and said Melton to get the written consent of said executors to this contract," Ayers to have five years in which to move the timber from the land, to which the executors gave their consent in writing April 6, 1892.

When Shirk heard of this contract, he objected to its

being consummated, because it would impair the security he held by virtue of his second mortgage, and an arrangement was then made by which Shirk should be paid $1,250 of the consideration for the sale of the timber to Ayers, which was done, and this sum was applied by Shirk as a credit upon Melton's indebtedness to him by reason of the note secured by the deed of trust to him, and which was deposited with the Third National Bank, but upon which note Shirk had paid the interest.

At the time of this transaction Melton was indebted to the executors of the Reed estate on other matters outside of the indebtedness for the purchase of the land in controversy. This other indebtedness was for other land purchased by Melton of them, and for interest and taxes for which Melton was liable. About $4,000 of the money received from Ayers was applied by the executors of the Reed estate to discharge this other indebtedness and the balance applied upon the debt secured by the deed of trust to Chapman.

At this time the equity of redemption in this land stood in the name of the defendant Newkirk. The negotiations for the sale of the timber to Ayers was conducted through Newkirk and the delivery of the deeds for the other land, the purchase money for which constituted the other indebtedness owed by Melton to the Reed executors, was also conducted through Newkirk, and it was with the full consent and approval of Newkirk that a part of the purchase money received from Ayers was applied by the Reed executors in discharge of this other indebtedness. Newkirk in a letter to these executors, dated April 19th, 1892, advises the executors to ratify the sale to Ayers of this timber and he transmits in that letter to these executors $5,000 in exchange and Ayers' note for $3,725, and advises them that he thinks it would be entirely satisfactory to Melton for the executors to deduct the price of thirty acres of their land from this money. Collins, one of the executors who conducted this negotiation, testified that the

money was so applied by Melton's direction, and that they never would have consented to the sale of the timber to Ayers if it had not been understood by them and by Melton that part of this purchase money for the timber was to be applied in discharge of Melton's other indebtedness to the executors. The executor, Osburn, testifies to the same facts. Shirk testified that it was well understood by Newkirk, Melton, the Third National Bank and himself that out of the moneys received by the Reed executors from the sale of the Ayers timber, whatever indebtedness Melton owed them, other than that secured by the Chapman deed of trust, should be first discharged and the balance should be applied as a credit upon the indebtedness secured by the Chapman deed of trust.

During the progress of the trial, when the amount and disposition of the Ayers money was being inquired into, it was stipulated between the parties and put as an admission in the record, as follows:

"It is admitted that E. D. Ayers paid on account of the purchase of the timber referred to in the testimony the sum of $10,275, as follows: $8,525, to the executors of the Reed estate accounted for by Mr. Collins in his testimony; $1,250, paid to Judge Shirk and the Third National Bank on account of the mortgage held by the Third National Bank; $500 paid for commission for the sale; and $200 which was deducted for the reason that the timber had been cut off of some of the land."

The account of the executors of the Reed estate with Melton showed credits to Melton for all the money received by them from all sources and showed what was applied as a credit on the note secured by the Chapman deed of trust, and further showed that at the time of the institution of this suit there was then owing the Reed executors by Melton on the note secured by the Chapman deed of trust a balance of $14,516.

Not until after the happening of all these events did the

plaintiff acquire any interest in these lands.    The money received from Ayers had been all paid and applied as all of the parties having any interest in the land had agreed, and its application acquiesced in, the timber removed and the transaction closed.

Plaintiff acquired his interest in 7,770 acres of the lands in controversy from Newkirk under a written contract with him and deeds made in pursuance thereof by which Newkirk transferred to him the land for a property in Illinois, called the "Polo Plant."    The contract between them provided among other things that plaintiff and Newkirk should deliver to each other abstracts of title to their respective properties and make the necessary and proper conveyances each to the other therefor to be exchanged, and to deposit these conveyances in the Midland National Bank of Kansas City, the conveyances to be warranty deeds, and to vest title to the property in fee and clear of all liens and incumbrances.

While the deeds from Newkirk to plaintiff for the lands were signed and acknowledged, and deposited with the Midland National Bank, he would not consent to their delivery to plaintiff, and about May, 1893, plaintiff instituted suit in the United States Circuit Court at Kansas City, against Newkirk, Melton and the Midland National Bank for a specific performance of the contract, and damages for breaches of warranty of title to the land described in the deeds from Newkirk to him.

The bill states, among other things, that the defendant, Newkirk had deposited with the said Midland National Bank two deeds conveying to plaintiff the 7,770 acres of land, which were full warranty deeds, and that he is informed and believes and charges the fact to be that said land so described and conveyed by said two warranty deeds was incumbered as follows:

"By trust deed made by said R. H. Melton and Almira Melton, his wife, to Thomas C. Chapman, trustee for Samuel C. Collins, W. P. Murray and Frank C. Osburn, executors of

the last will of William Reed, deceased, dated November 30th, 1889, and recorded in book 49, page 375 of the records in the recorder's office, Benton county, Missouri, securing an indebtedness of $12,702.26, together with accrued interest thereon, which still stands unsatisfied and unreleased, and also deed of trust from Richard H. Melton to R. H. Moses, trustee, for W. S. Shirk, dated December 4th, 1889, recorded December 10th, 1889, in book 49, page 375, of the records in the office of the recorder of deeds of Benton county, Missouri, securing an indebtedness of $7,000 with accrued interest thereon, and that the same still stands unsatisfied and unreleased, and that said two trust deeds, with accrued interest thereon, now amount in the aggregate to the sum of $23,000 and constitute an incumbrance upon said land."

It also alleged that Melton was directly interested in the ownership of the land, although the title was in the name of Newkirk, and Melton was acting for himself as well also as Newkirk.

The bill prays for a specific performance of the contract; that the Midland National Bank be required to deliver to plaintiff the two warranty deeds deposited with it in escrow by Newkirk, and for a discharge of the two deeds of trust above referred to or, if the defendants, Newkirk and Melton, could not make a perfect and clear title to the plaintiff to said land, then that the plaintiff might have judgment against them for the sum of $75,000 and for such other relief as they might be entitled to.

On the twenty-fifth day of January, 1895, a decree was entered therein for plaintiff. It finds among other things, that the lands referred to were subject to the lien and incumbrance of the said two deeds of trust above referred to and that a part consideration and purchase price of said Polo manufacturing establishment was the land in said Benton county free and clear of incumbrance.

The decree then proceeds: "And it further appearing to

the satisfaction of the court that the defendants consent that the complainant may take judgment for the sum of $360, the value of said 120 acres of land (the title to which had failed), against Cyrus Newkirk, and may have restored to him and delivered again into his possession the deed and bill of sale of the Polo manufacturing plant hereinbefore described and that the possession of the said 'Polo Plant,' which has been in the complainant at all times heretofore, is hereby decreed to be in him as the owner of the said 'Polo Plant.' The said judgment for $360 and the return of the 'Polo Plant' to the complainant as owner is by agreement the consideration for the defendant Cyrus Newkirk's breach of his deeds hereinbefore stated to be in the hands of these custodians and in satisfaction of any breach of warranty on account of the covenants expressed or implied, in said deeds and in full of all liability and damages whatsoever which may heretofore have been incurred or may hereafter be incurred by the complainant or his assigns on account of said deeds so placed in escrow or on account of the contract between him and the defendants, Newkirk and Melton, out of which this action has grown and on account of all matters and things whatsoever growing out of the premises heretofore, or after the date of this decree. And it is further found by the court that by consent of the parties made in open court the custodians are to return and deliver to the complainant in this cause the deeds to said Benton county lands and that such delivery, with the judgment of $360, and the return of the said deed and bill of sale of the 'Polo Plant' shall be in full compliance with the contract between the parties."

In accordance with this decree the two deeds from Newkirk were delivered to the plaintiff by the Midland National Bank. The deed covering the lands from which the timber was sold to Ayers conveys 3,040 acres of land and states in the face of the deed as follows:

"The saw, piling and tie timber has been sold off of the above described lands to E. D. Ayers and he has five years

from the — day of April, 1892, to cut and remove the same therefrom, and this deed is made subject to that contract with said Ayers."

In the meantime the note held by the Third National Bank of Sedalia was not paid. The original note which was secured by the Shirk deed of trust was renewed once but afterwards this renewed note was carried by the bank without further renewal as security for the joint note of Shirk and Melton. Their joint note was renewed from time to time, Shirk paying the interest thereon.

On the twenty-first day of October, 1889, the Third National Bank commenced a suit in the circuit court of Benton county against Melton to foreclose the Shirk deed of trust and judgment was entered foreclosing the same and execution ordered.

Before the sale of the timber land to Ayers, in March, 1892, Melton had defaulted in the payment of the interest due upon the notes to the executors of the Reed estate, and had defaulted in the payment of taxes upon the land and the executors began to take measures looking to a foreclosure of their deed of trust. For this purpose they wrote to the defendant Shirk, and employed him as their attorney to have the land advertised for sale under their deed of trust, and to look after their interests in all the matters pertaining to the foreclosure. Shirk, being interested in the land by reason of his liability for Melton upon the note to the Third National Bank, and secured by a second mortgage upon this land, made an arrangement with the executors by which he could buy the land at the proposed sale without having to pay all of the purchase money in cash and by which he would be permitted, if he should become the purchaser of the land, instead of paying the full amount of the debt due the Reed estate in cash at the sale, to pay such a proportion thereof as might be agreed upon and give his notes, secured by a deed of trust upon the land, for the balance of the purchase money coming to the Reed estate.

It was upon the basis that if Shirk became the highest and successful bidder for the land at the sale under the deed of trust, then the executors, instead of requiring the whole of his bid in cash, would accept a part in cash and take Shirk's note for the balance of his bid, giving him such time as might be agreed upon, and the note to be secured by a deed of trust upon the lands. This was substantially the arrangement finally agreed to prior to the sale, which was advertised to take place on the twenty-seventh of December, 1894. This arrangement was upon the distinct understanding that the land should go to the highest bidder and was only to stand in case Shirk became the successful bidder. The advertisement for the sale was to be in accordance with the provisions of the deed of trust, and if Shirk should become the highest and successful bidder, then the executors were to make the terms with Shirk as above narrated.

No positive arrangement was made with Shirk as to the amount of money he would pay at the sale in case he became the successful bidder. The executors had stated to him that they wanted $4,000 or $5,000 in cash and Shirk only wanted to pay $1,000 in cash in addition to the accrued interests, taxes and costs. Osburn, one of the executors, testified that he expected to attend the sale in person and would see to it that the land at the sale brought the entire debt, interest and costs coming to the executors.

This was the condition of the title to the land and the situation of the parties interested therein when the executors of the Reed estate commenced their proceedings to foreclose their deed of trust. Default had been made in the payment of interest and taxes, Chapman, the trustee, refused to act; the defendant, George W. Laird, sheriff of Benton county, was called upon to act, and an advertisement inserted in the newspapers setting the day of sale for the twenty-seventh day of December, 1894, in accordance with the terms and provisions of the deed of trust.

The plaintiff commenced this action on the twenty-sixth day of December, 1894, and obtained a temporary restraining order from the judge of the circuit court of Benton county, and the sale was stayed.

Afterwards, on the seventeenth day of April, 1895, plaintiff filed an amended petition upon which the case was tried. After setting out the contract of the plaintiff with Newkirk for the purchase of the land, the suit in the United States Circuit Court at Kansas City, and the decree of that court under which the plaintiff claimed title, it states the facts in relation to the execution of the Chapman deed of trust and the advertisement of the lands for sale thereunder. It avers that the plaintiff attempted to purchase of the executors of the Reed estate the notes they held or to make some satisfactory arrangement.

The petition then avers that the defendant Shirk claims to hold a second deed of trust upon all of the lands owned by plaintiff upon which deed of trust Shirk claimed there was due about $9,000, but the plaintiff charges that this deed of trust is wholly without consideration; is not a lien upon any of the land; that the indebtedness set forth in the deed of trust does not in any way represent any indebtedness, lien or claim on the land; that it does not in fact describe or include any of the lands of plaintiff; that plaintiff had no notice whatever of any claim of defendant Shirk to or upon the said land; and that the original indebtedness had been canceled and the debt renewed and extended by the execution of other notes in lieu thereof.

It then sets out the proceedings in the foreclosure suit by the Third National Bank and avers that the judgment ought not to be asserted against the plaintiff, because he was not a party to it, and because the lands were not described in the judgment, etc.

The petition avers that the said executors, for the purpose of defeating the claims and rights of the plaintiff, and of

securing the defendant Shirk, and the said Third National Bank, an advantage superior to the plaintiff, have entered into an agreement and conspiracy with them, by which the defendant Shirk was to be permitted to manage the sale on his own terms and for his own protection, and "to the exclusion of this plaintiff." That said Shirk was to be permitted to buy on his own terms, as he might see fit, to protect his pretended deed of trust, and that such an agreement would be carried out unless the defendants were restrained from making such sale.

It further alleges that said executors proposed to sell all the lands to defendant Shirk, as well as those not claimed by the plaintiff as those which are claimed by him, and that the lands not claimed by the plaintiff should be first sold. It avers the plaintiff's willingness to pay whatever is owing under the Chapman deed of trust, including interest and taxes, as the court may on a final hearing adjudge to be owing. The lands claimed by the plaintiff are then described, as being a part of the lands included in the Chapman deed of trust and in the Shirk deed of trust.

The petition then prayed for a temporary injunction and that the Shirk deed of trust be declared void, etc.

The defendants, the Third National Bank, R. H. Moses and W. S. Shirk, filed a joint answer. They admit, as plaintiff alleges, his contract with the defendant Newkirk, and the suit instituted by him in the United States circuit court against Newkirk and Melton, but they allege that in the bill filed by the plaintiff in said cause the plaintiff averred and charged that the land for which he had contracted with Newkirk and Melton was subject to the two deeds of trust, setting them up fully, as hereinbefore stated, which were set up by plaintiff as a breach of the contract and deeds of warranty of said Newkirk; that plaintiff obtained a decree in said cause which by his consent and agreement adjudged to him a return to him of all the "Polo Plant," which was to be in full satisfaction of the

breach as aforesaid, and that by reason thereof the plaintiff is estopped now to deny that said deed of trust was not a valid and binding deed of trust securing valid indebtedness. The answer denies all the charges attacking the validity of the Shirk deed of trust.

The answer then avers affirmatively the facts as hereinbefore recited as to the purchase of the lands by Melton, the borrowing of money to make the cash payment thereon, the execution of the notes and deeds of trust securing the same and the foreclosure suit, and asserting that the Shirk deed of trust is a valid and subsisting lien securing the indebtedness therein described.

It further alleges that Shirk, being security upon the said note of Melton held by the Third National Bank, it was to his interest to protect the lands under the foreclosure under the first deed of trust, and he took upon himself the burden of paying the indebtedness therein described in full; that he made an arrangement with the said executors by which, if he should become the purchaser of said land at said sale, he might execute his notes secured by a deed of trust upon the lands bought for a part of the purchase money; that he should pay the costs of said sale, and all the interest due upon the said indebtedness and all taxes, and that said contract was legitimate and proper; that the defendant, Laird, in the sale of said land under the terms of the said advertisement and deed of trust would have proceeded therewith in accordance with the law, and that the sale would have been an open, fair and public sale, and allowing the plaintiffs, as well as every other person, to come in and bid upon said lands.

The defendants, the executors of the Reed estate, and G. W. Laird, sheriff, filed a joint answer in which among other things they say it is not true that the plaintiff was advised by letters from these defendants or upon information from any one or that the fact is, that the said defendants have entered into any agreement or conspiracy with the de-

fendant Shirk, to defeat the claims of the plaintiff or to secure to the defendant Shirk any advantage over the plaintiff or any one else, or in violation of their duties as such executors, and these defendants say that it is not true and they deny that they have made any contract or agreement by which the defendant Shirk should be permitted to manage the sale, under said advertisement and deed of trust for his own protection or to exclude the plaintiff or that he should be permitted to buy in said land on time or upon his own terms, as he might see fit, for the purpose of protecting whatever rights he might have under said second deed of trust, or that if said sale should occur such agreement would be carried out to the great and irreparable injury of the plaintiff or to the injury of the plaintiff in any respect.

And these defendants further answering say that the truth about this matter was that the said Melton who was the debtor of these defendants and who executed the deed of trust upon said lands to secure the indebtedness due and owing these defendants, was, and for a long time has been, and now is hopelessly insolvent, that the interest upon the indebtedness to these defendants was not paid, that the taxes upon said land were permitted to become delinquent and were not paid, that the only credits made upon the indebtedness due and owing these defendants by the said Melton was from sales of lands included in their deed of trust or from timber growing thereon, that these defendants were greatly dissatisfied with the status of their said indebtedness and thought they were in great danger of losing a greater part thereof, and that negotiations were had and entered into by and between these defendants and the said Shirk who claimed to either own or represent the said second deed of trust, by which these defendants agreed with the said Shirk that if he, the said Shirk, should become the purchaser of the said lands under the foreclosure by these defendants of said deed of trust, and would execute to these defendants his notes for such part of the purchase money as

should be agreed upon and secure them by the deed of trust upon the lands so purchased thereunder and would pay up the costs of said sale and all taxes and interest due and unpaid thereon, and would keep the same fully paid hereafter, that they would loan to him so much of the said purchase money as might be agreed upon, that such an arrangement was made long before these defendants had any knowledge that the plaintiff had any interest whatever in said lands, the exact amount of which was agreed upon when the restraining order was issued in this case; that it was made by these defendants for the purpose of better securing their said indebtedness and of obtaining, as the maker of the said notes, a solvent, responsible and reliable debtor, and that it was greatly to the interest and advantage of these defendants to make such an arrangement, that it was such an arrangement as is not forbidden, either by good morals or the laws of the land, and such as any prudent creditor would seek to make for the protection of his own interest, and these defendants were proceeding to foreclose said deed of trust when enjoined by the order in this case for the sole purpose of realizing upon and securing their said indebtedness and without any of the pretended and alleged illegal purposes averred by the plaintiff in his petition, and without any intention or purpose of in any manner injuring the plaintiff in whatever claims he might have to said lands, but for the sole and only legitimate and proper purpose as aforesaid.

To these answers the plaintiffs filed replies, general denials of the new matter contained therein.

During the trial plaintiff asked the witness Collins what he had done with the $8,500 he received from the sale of the timber to Ayers, to which he answered that about $4,000, was applied in discharge of other indebtedness of Melton to the executors, outside of that evidenced by the notes secured by the deed of trust, and all the balance credited upon these notes. He further testified that the agreement was that the money was

to be so applied and it was so understood by all of the parties interested in the land at the time of the transaction and that he never would have signed the agreement consenting to the sale of the timber if he had not understood that the money was to be applied in the manner it was.

The deed of trust to R. H. Moses, trustee, to secure the $7,000 note to Shirk, showed some changes and interlineations. The original deed was shown in evidence and the change was in that part of the deed of trust which originally described the land as located in Pettis county, and it was changed to read in Benton county, and the name of Almira Melton, wife of Richard H. Melton, was also interlined.

Shirk in his testimony (and he was the only witness examined upon this question) testified where and how these changes were made in this deed of trust and all the circumstances in connection therewith. In the record of this deed of trust as recorded in the recorder's office of Benton county the land is described as situate in the county of Pettis, and Richard H. Melton alone is the party of the first part, and in the latter part of the instrument it is provided that if the trustee, R. H. Moses, does not act, then the sheriff of the county of Pettis should act, and the real estate should be sold in the county of Pettis.

It appears from the original deed of trust that Richard H. Melton, of Kansas City, Missouri, and Almira Melton, his wife, are the parties of the first part, and the land is described as being situate in the county of Benton, the word "Pettis" being scratched out and the word "Benton" put in its place.

When Shirk was examined as a witness, he was handed the deed of trust and asked if he had prepared it. He said that he had, though some of it was in the hand writing of Major Melton. Then follows his explanation, to wit:

Q. "I will ask you to explain the alterations that appear upon the face of the deed of trust. State how they occurred and what is the fact about them?"

A.   "There is but one alteration on the deed of trust, which I will explain in a few moments.   The change, scratching out of the printed 'County of Pettis' and writing above it the 'County of Benton' I recollect about very well.   That alteration was made at the time the deed was drawn.   Major Melton gave me the description and I had my typewriter copy it, and it had to be altered considerable, as you see upon the face of the deed of trust, and before he came to take it across the street and acknowledge it before Mr. Van Wagner, the notary public, Major Melton called my attention to the fact that it was drawn upon a Pettis county blank and that it read then 'situate in the County of Pettis.'   I made that alteration at that time before it was signed by Major Melton.   In the body of the deed above—"

Q.   "Was it filed in that shape by you after he acknowledged it, was it filed in that condition?"

A.   "Yes, yes, sir.   That alteration was made before Major Melton signed or acknowledged the deed.   He called my attention to the fact and the reason I recollect it so well was that afterwards when I sent it up to him to be signed by his wife, he then wrote me back and called my attention to the fact that I had neglected to scratch out the word 'Pettis' in the other places.   That word 'Pettis County' was scratched out and the words 'Benton County' written in there before Major Melton signed it or before it was acknowledged."

He was then asked about the signing and acknowledgment by Mrs. Melton and stated that at the time the deed of trust was drawn up and acknowledged by Major Melton, Melton's wife was not in Sedalia and his wife's given name was left blank in the deed; that Melton was anxious to close the transaction that day and his wife could not be procured to sign the deed of trust on account of her absence.   So the deed of trust was taken without the wife being joined.   It ran along for some time, Shirk expecting Melton would pay the money secured by the deed of trust, but in February, 1891, he became uneasy and insisted on Major Melton's wife signing and

acknowledging the deed. Shirk thereupon either took or mailed the deed of trust to Melton at Kansas City and Melton himself wrote his wife's given name in the orginal deed of trust, as the witness testified, and it showed that these words were in Major Melton's hand writing. It was signed and acknowledged by Mrs. Melton in Kansas City and returned to Shirk.

It is insisted by plaintiff that the court below erred in allowing any part of the money received from Ayers by Newkirk on his purchase of the timber to be applied to the payment of the debts owing by Melton to the executors of Reed, other than the debt due by Melton to them for the land involved in this litigation. The argument is that the timber contract between Ayers and Newkirk, by which it is provided that the purchase money for the timber amounting to $10,750, was to be paid on the indebtedness of Melton to Reed's estate, upon Melton's getting the written consent of the executors of Reed to the contract, and the acceptance thereof by said executors which describes the same lands, and says, "according to the contract, a copy of which is hereto attached, which said lands were sold by us to said Melton and upon which we now have a deed of trust for the purpose specified in said contract, and authorize him to cut and remove the same," must be construed together, and when this is done it is conclusive that the proceeds arising from the sale of the timber sold from this land were to be, and must be, applied to the payment of the indebtedness secured by the deed of trust on these lands, which was executed by Melton to secure the payment of the balance of the purchase money.

But these instruments do not of themselves constitute the entire arrangement between the parties interested with respect to the manner in which the money arising from the sale of the timber was to be applied, and must be considered in connection with all the facts disclosed by the record which tend to show the intent and purpose of Melton and Newkirk and the executors of Reed in the application of the money.

The contract for the sale of the timber was made to Ayers on the thirtieth day of March, 1892, and was on record long before plaintiff acquired any interest in the lands. At that time the legal title to the land was in Newkirk, but he held it only as security for the payment of certain debts owing him by Melton who owned the equity. From this sale, $9,775 was realized, $1,250 of which by agreement between Newkirk, Melton, and the executors of Reed were paid to Shirk on account of the second mortgage, and $8,525 was paid to the executors of the Reed state. Of this sum the executors applied $4,525 as a credit on the debts secured by the Chapman deed of trust and applied the balance on the indebtedness owing to them by Melton.

In the absence of any directions to the contrary by the debtor who owes his creditor more than one valid and subsisting debt, the creditor has the right to apply any payment made to him by the debtor to either of the debts that he may choose. [Beck v. Haas, 111 Mo. 264.]

What evidence then was there that the executors of Reed were directed by Newkirk to apply the money arising from the sale of the timber to the payment of the notes executed by Melton to them to secure the payment of the purchase money for the land, which was secured by the Chapman deed of trust thereon, to the exclusion of other notes held by the executors against Melton which were executed by him for other lands belonging to said estate, which had theretofore been sold to him by said executors?

There is no provision in the contract between Ayers and Melton, agent for Newkirk for the sale of the timber, or the written consent of the executors of Reed thereto, as to how the money arising from that sale should be applied, except that it was to be "paid on the indebtedness of said Melton to said Reed estate," and as Melton was indebted to that estate on account of the purchase of other lands than the lands in question, the executors in the absence of some direction by Melton or Newkirk, to apply the money as a credit upon the notes

given for the purchase money of the land in question, they had the right to apply it to the liquidation of other indebtedness of Melton to the Reed estate.

Moreover, Collins one of the executors who conducted the negotiations testified that the money was so applied by Melton's directions, and that they never would have consented to the sale of the timber to Ayers if it had not been understood by them and by Melton that part of this purchase money for the timber was to be applied in discharge of Melton's other indebtedness to the estate of Reed. The evidence also tended to show that Newkirk knew how the money was applied long before his sale of the lands to plaintiff, and acquiesced therein. Furthermore, Osburn another of the executors, and Shirk testified to substantially the same facts.

It is claimed by plaintiff that the arrangement between Shirk and the executors of the Reed estate, by which Shirk was to bid in the lands for the full amount claimed by the executors to be due from Melton to that estate, with interest, taxes, and costs of sale and pay in cash only the interest due, taxes and costs of sale, and give his note or notes for the balance secured by deed of trust on the land, payable on time, and, drawing such interest as they might agree upon, was collusive and fraudulent as to the owner of the land. Any collusion which prevents or destroys competition, or which prevents fair and impartial bidding will render a trustee's sale invalid, but in the case at bar it does not appear that any one would have been prevented from bidding at the sale by reason of the arrangement between Shirk and the executors, nor does it appear that it would have in any way tended to prevent competition at the sale. The plaintiff was not in any way deceived by the arrangement, because he knew all about it, and had himself tried to make a similar arrangement with the executors but had failed to do so, because of the arrangement with Shirk which had then been made, and of which he was informed by the executors.

Mead v. McLaughlin, 42 Mo. 198, was an action to redeem certain property, which has been sold by McLaughlin to one Huxley under the authority of a deed of trust, which provided that the sale should be for cash. At the sale Huxley paid for the property only a portion of the sum named as the purchase money, but gave his notes to the holders of the liens upon the property for the balances due them, over and above the amount realized by them at the sale; and in consideration of these notes, the lien holders relinquished all their claims against the maker of the deed of trust, and it was ruled that the notes so given was equivalent to cash placed in the hands of the trustee, and in point of fact no credit was given to the purchaser for any part of the purchase money by the arrangement.

There is no pretense in the case in hand that the property would have brought any more, if this arrangement had not existed, or that any person would have been kept from bidding by reason thereof.

Another insistence is that the court erred in not rendering judgment in favor of plaintiff declaring the deed of trust of Shirk, and the claim of the defendant, the Third National Bank of Sedalia, and each of them, null and void. This contention has for its predicate the fact that the lands were described in the deed of trust as originally filled out as being located in Pettis county, and that there was an alteration made in it after its execution which rendered it invalid. The alteration in the deed of trust was made by erasing the word "Pettis" county, and writing "Benton" county in its stead. Shirk the beneficiary in this deed testified that when it was prepared the parties to it were all in Sedalia, Pettis county. The land lies in Benton county. Shirk wrote the deed of trust, at his office in Sedalia, in which he had blank deeds of trust for use in the preparation of deeds of trust upon real estate in that county, and in filling out this blank he overlooked the fact that the

word "Pettis" was printed all the way through the deed of trust, next preceding the word county wherever it occurred. That when the deed of trust was presented to Melton to sign, he called his, Shirk's, attention to the fact that the lands were described as being located in "Pettis" county instead of Benton, and that he at once erased the word "Pettis" in the part of the deed describing the location of the lands, and wrote over it the word "Benton," and after this change was made the deed was sent to Melton at Kansas City and he signed and acknowledged it.

It is true that the record of the deed in Benton county shows that the word "Pettis," in the description of the land was not erased when the deed was recorded, but this record also shows that the recorder made other mistakes in recording the deed, so that such occurrences were not unusual with him.

But Shirk testified that Mrs. Melton was not in Sedalia when the deed of trust was prepared, and as he did not know her given name, a blank was left for it where it should have been inserted in the deed. And that afterwards the deed was sent to Kansas City where Mrs. Melton was, when her name was written in it by her husband, and that she thereafter signed it.

It is manifest therefore that the changes in the deed of trust were either made before it was signed, or with the knowledge and consent of the mortgagor, so that whatever imperfections there were in it when first written were corrected with the knowledge and consent of the grantor thereafter, which to all intents and purposes cured any defect in it with respect to the county in which the land is located.

Had the alteration in the deed been without the knowledge and consent of Melton, it would have rendered it void, as the authorities cited by plaintiff abundantly show, but that is not this case. It is only where an alteration of a written instrument or contract is made without the knowledge and consent of the parties thereto, that by reason thereof it becomes

Coney v. Laird.

invalid, but it does not do so when made with the knowledge and consent of all the parties.

We do not think there is, or can be, any question but that this deed of trust covered the renewal notes, as it was nothing more than one and the same debt. Nor do we agree with plaintiff that the records of Benton county did not disclose that Shirk had a deed of trust on these lands. They were described in the mortgage by sections, township and range; and according to this description it was recorded in the proper county, and the fact that the lands were by the mortgage located in Pettis county, when in fact they were in Benton county, did not invalidate it. Besides the original deed as corrected, properly located the lands in Benton county.

Moreover, by the bill filed by plaintiff in the Federal court against Newkirk, Melton and others, he recognized the Chapman and the Shirk deeds of trust, as valid and subsisting liens upon the property, and after having assigned these two deeds of trust, which then amounted to about $23,000, as incumbrances on the property in assigning breaches of the warranty contained in the deeds to the lands from Newkirk to him, and derived the benefit thereof in the judgment rendered in that suit in his favor he should not now be permitted to say that the Shirk deed of trust was and is not valid.

Finding no reversible error in the record, we affirm the judgment. *Gantt, P. J.,* concurs; *Sherwood, J.,* absent.