McCUNE et al. v. ORA M. GOODWILLIE and GEORGE W. BROWN; ORA M. GOODWILLIE, Appellant.

Division One, May 29, 1907.

1. **EQUITY: Instruction.** In an equity case instructions fill no material place, except to indicate somewhat the trend of the chancellor's mind.

2. **WITNESS: Grantor of Deed: Other Party Dead: Subsequent Acts.** The grantee being dead, the grantor in the deed is not competent to give conversations between himself and the grantee tending to show that the deed was made to the grantee as a mere conduit for the transfer of the title to the grantor's wife. But where the grantee did not convey to the grantor's wife, but the grantee's wife after his death asserts title to the land by adverse possession and by reason of a tax sale conveying the grantor's interest to her, letters from her to him, material to that issue, are competent, and he is competent to identify those letters.

3. ———: ———:- ———: Waiver by Cross-Examination. The mere cross-examination of a witness on new matter does not make the witness thenceforward the examiner's own witness. But if a witness be incompetent and if the party insisting on his incompetency nevertheless examines him on new matter not touched upon or brought out in chief, then, as to such new matter, his incompetency is waived.

4. JUDGMENT: Final: No Objection. An objection that a decree of a court setting aside certain deeds was not final, but interlocutory, must be made in the trial court, to be available on appeal. And an objection that the foreign court rendering the decree had no jurisdiction to render a decree affecting title to real estate in this State, is not such an objection.

5. ———: ———: Partition: Acceptance: Estoppel. Whether or not the decree of a foreign court setting aside deeds to Missouri lands and establishing a will, was final or interlocutory, is immaterial, if the devisees took part in a domestic distribution according to the terms of the will and recited the decree in their deeds. Having accepted the decree and enjoyed benefits under it, they and their privies are estopped to deny the decree's finality. ·

6. ———: Appeal: Effect of Notice: No Objection. The appellate court will not decide that the words "gave notice of appeal" mean or do not mean that an appeal was allowed from the judgment of a foreign court, if no objection of that kind was made below and in the absence of proof of such meaning.

7. EQUITY JURISDICTION: Objection. An objection that an Ohio court had no jurisdiction to enter a decree affecting real estate in Missouri is not a challenge of the equity jurisdiction of the court.

8. ———: Foreign Court: Binding Effect of Decree: Will: Minor. Brown, who lived in Ohio, devised his lands in Missouri and Ohio to his four children, but later conveyed them by deeds to a daughter, and those deeds, in an Ohio equity court having jurisdiction of the persons of the parties, including the minor son of the daughter, who was then deceased, were set aside after Brown's death. Held, that the court had jurisdiction over the subject-matter, namely the validity of the deeds, and, while the decree did not directly affect the bare legal title to the Missouri lands, it was binding on all parties to the suit, including the minor, when he attained his majority, on every issue in the case.

9. ———: ———: ———: ———: Estoppel. The parties to said suit, by making a domestic partition of the Missouri lands among themselves, based upon that Ohio decree and Brown's

will, and by accepting deeds in severalty, by the recitals in their respective deeds, estopped themselves and the privies from disputing the binding effect of that decree.

10. EQUITY JURISDICTION: Foreign Court: Estoppel: Ratification: Minor. And where the minor heir of the grantee of the deeds set aside by the decree, adopted the partition deeds made by the executor of the will in accordance to the will and in accordance to the decree of the foreign court setting aside those deeds, and ratified the partition deeds, after he became of legal age, he too is estopped to deny the binding effect of the decree and of the partition.

11. ———: ———: ———: ———: By Other Devisee. And each coparcener and devisee who took lands under that decree and friendly partition, and thereby received lands that they would not have received had not the decree and the partition deeds in pursuance thereof been made, are estopped to dispute, on behalf of the minor, the binding effect of the decree and partition.

12. WILL: Fee or Life Estate. The testator gave and devised his real estate, "subject to the limitations and provisions hereinafter expressed, in equal proportions" to his four children, and in the next item said that in case any of said children shall die leaving no child surviving him or her, "the aforesaid legacies and shares so given to said deceased child, instead of being held by the wife or husband of such decedent, shall pass to and be held by my grandchildren then living." Held, that there was no devise of an absolute fee simple estate at the outset to the several donees with a subsequent attempt to cut it down to a less estate by ambiguous words inferential in their meaning, but the limitation runs through the entire instrument; and, hence, when a son died leaving no child his will devising his lands to his wife conveyed nothing to her, but such son took an estate determinable by the event of his death without a child, and that having occurred his "share" went to testator's grandchildren.

13. DEED: Delivery: Acceptance: Record. To constitute a good delivery a deed must not only pass from the actual and constructive control of the grantor, but the grantee must accept it. Recording it may be presumptive evidence of its delivery, and, being for the grantee's benefit, may be presumptive evidence of its acceptance. But the presumption is a rebuttable and not a conclusive one, in either case.

14. ———: ———: ———: ———: To Intermediary for Wife: Setting Aside. The owner of Missouri land, residing in Ohio and being childless, and his and the brother's adjoining land having been rented as one tract for some years, through the brother, who resided at Detroit, acting for both of them, made a

deed in September, 1892, conveying it to the brother, and in January put it of record, but later recovered it from the possession of the recorder, and it was not shown to ever have been in the possession of the brother, who died in the summer of 1893, leaving a will by which he devised his property to his wife. *Held*, that it was competent to show, by the correspondence and course of dealing between the two brothers, and between the survivor and the widow of the other after his death, that there was no delivery of the deed, and that no reliance was placed upon it as a muniment of title, and that it was made in order that the grantor, through the deceased brother as a conduit, might transfer the land to his own wife; and the proof being sufficient for that purpose, it will be set aside.

15. LIMITATIONS: Hostile Possession. To establish title by limitations the possession must not only be continuous, but must be hostile and continuously hostile. And the law always presumes that possession is consistent with the true title and ownership.

16. ———: ———: Agency. Where two non-resident brothers, owning adjoining lands, which really constituted one tract, rented it together, one brother acting for both, collecting the rents, paying the taxes and expenses, and regularly turning over the balance to the other, the one who acted as agent for the other did not have hostile possession of the other's land.

17. ———: ———: ———: Agent's Wife. And where the brother who acted as agent for the other died, leaving his property to his widow, and she stepped into her husband's shoes, and continued to collect the rents on the lands, paying expenses and dividing the balance with the other, her possession was not adverse to him.

18. ———: ———: Friendly Inception. A possession friendly in its beginning and begun in subordination to the true title, does not change into a hostile one by a mere change of mental attitude, but continues friendly, unless, by open and unequivocal acts, equivalent to ouster or disseizin and sufficient to bring notice home to the true owner, it has been changed into one adverse and hostile to him.

19. ———: Agent: Rents: Tax Sale. A purchase at a tax sale by one upon whom rests the duty of paying the taxes, operates merely as a payment of the taxes, leaving the title as if the taxes had been paid before the sale. So that, where a widow, acting for herself and for her husband's brother, who owned the land adjoining that which had been devised to her, rented his and her land as one tract and divided the rent money with him, holding back enough to pay the taxes, and while doing so caused the land to be sold for taxes in a suit brought by publi-

cation against him, and at the sale (for the very years for which she had held back rent money to pay taxes) bought the land herself, she took nothing, and the title remained just where it was before the sale.

20. **TAX SALE: Life Tenant: Remaindermen.** A tax suit brought against a life tenant only, and a sale of the land in pursuance thereto, do not affect the title of the remaindermen.

Appeal from Henry Circuit Court.—*Hon. W. W. Graves*, Judge.

AFFIRMED.

*Mark C. Campbell* for appellant.

(1) The court erred in admitting in evidence the decree of the court of common pleas of Ohio, and in giving to said decree the force and effect of setting aside the deed from Dixon Brown to Catherine A. Brown to lands located in Henry county, Missouri. Bank v. Bank, 155 Mo. 103; 13 Am. and Eng. Ency. Law (2 Ed.), 988. (2) The court erred in admitting the evidence of the witness McBeth as to the court of common pleas of Ohio being a court of equity jurisdiction, and there is no evidence that it had such jurisdiction. Hofheimer v. Lusen, 24 Mo. App. 658; Greenleaf on Evidence, p. 486; Robertson v. Staed, 135 Mo. 135. (3) The court erred in holding that Murray Brown was estopped from claiming title by limitation against the plaintiff Stafford on account of having accepted a deed to eighty acres of the land in question from Barr, and in holding that appellant did not have title by limitation. Blodgett v. Perry, 97 Mo. 272; Tiedeman on Equity, p. 107; Bigelow on Estoppel (3 Ed.), p. 484; Tiedeman on Equity, p. 110; 11 Am. and Eng. Ency. Law (2 Ed.), 441; Vasquez v. Ewing, 24 Mo. 30, 46 Mo. 38; Donaldson v. Hibner, 55 Mo. 492; Barker v. Circle, 60 Mo. 258; Rosenberg v. Gibson, 165 Mo. 24; Wilkerson v. Eiler, 114 Mo. 245. (4) The

court erred in holding that appellant took no title to the lands described in the tax deed by virtue of said deed.   (5)   The court erred in construing the will of Dixon Brown and in holding that the grandchildren of the testator, and not appellant, took the title to the land described in the deed from Barr to Murray Brown, upon the death of said Brown.   Stevenson v. Fox, 11 Am. St. Rep. 924; Green v. Sutton, 50 Mo. 186; Rines v. Mansfield, 96 Mo. 395; Cromwell v. Orton, 126 Mo. 355; Cromwell v. Wolff, 148 Mo. 343; Cook v. Crouch, 100 Mo. 39; Small v. Field, 102 Mo. 104.   (6) Even though it should be conceded that the court properly held that appellant's holding was not adverse to the life estate of George W. Brown, yet appellant's holding certainly was adverse to Frank B. Stafford.

*Parks & Son* and *Flory & Flory* for plaintiffs-respondents; *C. C. Dickinson* and *John Ferguson* for Brown, respondent.

(1)   Under the provisions of the will upon the death of Murray Brown, without issue, the grandchildren of Dixon Brown, being respondents or plaintiffs herein, became the owners in fee of the tract conveyed by Barr to Murray Brown; and upon the death of George W. Brown without issue, such grandchildren will be the owners in fee of the tract conveyed by Barr to George W. Brown.   Gannon v. Pauk, 183 Mo. 265; Gannon v. Albright, 183 Mo. 238; Yocum v. Siler, 160 Mo. 281; Suydam v. Thayer, 94 Mo. 49; Thompson v. Craig, 64 Mo. 312; Harbison v. Swan, 58 Mo. 147; Farrar v. Christy, Admr., 24 Mo. 453.   (2)   Murray Brown and all persons claiming under him, as well as all the children of Dixon Brown and beneficiaries under his will, are, by the parol partition made by the children under the will, and by the deeds, made in pursuance of the provisions of that will and of such partition, estopped thereby from claiming now that Cath-

erine A. Brown and not Dixon Brown was the owner of the lands thus divided and conveyed as the lands owned by Dixon Brown; and appellant is estopped thereby to deny that the deed from Dixon Brown to Catherine Brown was not made inoperative by the "Ohio" decree. 2 Herman on Estoppel, sec. 630, p. 767; 2 Devlin on Deeds, secs. 1263, 1289, 1291; Reynolds v. Kroff, 144 Mo. 447; Benevolent Society v. Murray, 145 Mo. 622; Fox v. Windes, 127 Mo. 502.  (3) Appellant and all parties claiming under Dixon Brown, as well as under the deeds made by Barr, are estopped to deny the validity of the "Ohio" decree, setting aside the transfers to Catherine Brown by Dixon Brown, and are estopped from now claiming that Catherine Brown owned the property thus transferred. And such parties are estopped by the conduct of the children of Dixon Brown: (a) in procuring those transfers to be set aside; (b) in making division of those lands as the property of Dixon Brown devised by him in his will; (c) in accepting deeds from the administrator of Dixon Brown under the power and provisions of his will; (d) in taking possession of and enjoying the lands thus devised and conveyed, thereby taking from the minor heir of Catherine Brown three-fourths and setting apart to such minor one-fourth of such property thus transferred. St. Louis v. Davidson, 102 Mo. 154; Austin v. Loring, 63 Mo. 23; Clyburn v. McLaughlin, 106 Mo. 521; Fox v. Windes, 127 Mo. 502; Benevolent Society v. Murray, 145 Mo. 622. (4) The common pleas court of Perry county, Ohio, in the suit to set aside the transfers and transactions between Dixon Brown and his daughter, Catherine Brown, had jurisdiction of the persons of all parties under whom the appellant and respondents claim, as well as jurisdiction of all the subject-matter of that litigation save the legal title to the Henry county land. The decree rendered in that court is valid and binding on all the parties to that

suit and those claiming under them, and appellant is estopped by reason of that decree in connection with the subsequent conduct of the parties, and the deeds made, to assert any title in Catherine A. Brown under the transfers set aside by the "Ohio" decree. Olney v. Eaton, 66 Mo. 663; Austin v. Loring, 63 Mo. 19; Proctor v. Proctor, 69 L. R. A. 686; State ex rel. v. Zachritz, 166 Mo. 313; Real Estate Co. v. Lindell, 133 Mo. 395; Coney v. Laird, 153 Mo. 408; Davis v. Wakelee, 156 U. S. 689; 4 Pomeroy, Eq. Juris. (3 Ed.), sec. 1318; 1 Pomeroy, Eq. Juris. (3 Ed.), sec. 135; Story's Eq. Juris., secs. 743, 744 (a), 899 and 900; Newton v. Bronson, 67 Am. Dec. 89; Massie v. Watts, 6 Cranch 148; Gardner v. Ogden, 78 Am. Dec. 192; Penn v. Hayward, 14 Oh. St. 302; Dale v. Rooseveldt, 5 Johns. Ch. 174; Mitchell v. Bunch, 22 Am. Dec. 669; Burnley v. Stevenson, 24 Oh. St. 474; 11 Am. and Eng. Ency. Law, 167-173; Brown v. Desmund, 100 Mass. 257; 2 Herman on Estoppel, sec. 214; Noble v. Grandin, 84 N. W. 465; Kirtland v. Loan Assn., 60 S. W. 149. (5) A purchaser at tax sale acquires only the title and interest of the parties who are made defendants. Moore v. Woodruff, 146 Mo. 597; Graves v. Ewart, 99 Mo. 13; Powell v. Greenstreet, 95 Mo. 13; Milner v. Shipley, 94 Mo. 106; Whelen v. Weaver, 93 Mo. 106; Holliday-Klotz L. & L. Co. v. Moss Tie Co., 87 Mo. App. 167. One who is in actual possession of land under claim of title cannot acquire title by purchase at tax sale. A purchase by such party operates merely as a payment of the taxes and a satisfaction of the judgment. Childers v. Schantz, 120 Mo. 314; Bone v. Tyrrell, 113 Mo. 175; Frank v. Caruthers, 108 Mo. 569; Pickering v. Lomax, 120 Ill. 289; Douglas v. Dangerfield, 10 Oh. St. 152; Allen v. Russell, 59 Oh. St. 137; Cooley on Taxation, p. 348; Lewis v. Ward, 99 Ill. 525; Black on Tax Titles, sec. 289; 27 Am. and Eng. Ency. Law, 954-957. (6) Where possession originates in subordina-

tion to the true title, claim of hostile ownership must be unequivocal and brought to the notice of the owner of the true title. Stevenson v. Black, 168 Mo. 549. Where the possession of realty is not in its inception adverse, but consistent with the title of the true owner, there ought to be some unequivocal conduct or claim to indicate the change in the character of the possession, in order that the occupant may claim by adverse possession. Hunnewell v. Adams, 153 Mo. 440. Possession by defendant who by deed has acknowledged title of plaintiff cannot be considered adverse. Tomlinson v. Lynch, 32 Mo. 160; Spencer v. Oneil, 100 Mo. 49; Crawford v. Ahrnes, 103 Mo. 88; Hunnewell v. Adams, 153 Mo. 440. To render possession adverse, it must be hostile in its origin and hostile in its continuance. Johnson v. Prewitt, 32 Mo. 55; Spencer v. Oneil, 100 Mo. 49; Crawford v. Ahrnes, 103 Mo. 88; Hunnewell v. Adams, 153 Mo. 440. Mere naked possession, no matter how long asserted without a claim of right, never ripens into a perfect title, or rather a title by limitation. To be effective, adverse possession must be hostile to the title of the true owner, and under a claim of right. Baber v. Henderson, 156 Mo. 573; Hunnewell v. Burchett, 152 Mo. 611; Comstock v. Eastwood, 108 Mo. 41; Johnson v. Prewitt, 32 Mo. 553; Burke v. Adams, 80 Mo. 504; Hunnewell v. Adams, 153 Mo. 440. (7) Delivery of a deed to be valid must be such as deprives the grantor of the possession and of the control of the instrument. Mudd v. Dillon, 166 Mo. 110; Huey v. Huey, 55 Mo. 694; Hamerstrough v. Cheatham, 84 Mo. 20; Abbe v. Justus, 60 Mo. App. 300. The only infallible test of a delivery is the fact that the grantor has divested himself of all dominion and control over the conveyance. Huey v. Huey, 65 Mo. 694; 3 Wash. on Real Prop. (4 Ed.), 290; 2 Greenleaf, Ev., 297. The fact that a person has executed and recorded a deed, where it is done without the

knowledge or assent of the grantee, will not, of itself, operate as a delivery to the latter, nor will the mere delivery of such an instrument for the purpose of having it recorded, if done without the knowledge of the grantee, constitute a delivery to him. 13 Cyclopedia of Law and Procedure, 569; Cravens v. Rossiter, 116 Mo. 338; 1 Devlin on Deeds, sec. 290; Wiggins v. Lusk, 12 Ill. 132; Sullivan v. Eddy, 154 Ill. 199; Alexander v. De Kernel, 81 Ky. 345; Metcalf v. Brandon, 60 Miss. 685. Delivery alone is not sufficient to make a deed valid. There must be an acceptance by the grantee. Rittmaster v. Brisbane, 19 Colo. 375; Herbert v. Herbet, 1 Ill. 354; Houfes v. Schultze, 2 Ill. App. 196; Woodbury v. Fisher, 20 Ind. 387; Brammerman v. Jennings, 101 Ind. 253; Com. v. Jackson, 73 Ky. 424; Owens v. Miller, 29 Md. 144; Comer v. Baldwin, 16 Minn. 172; McGehee v. White, 31 Miss. 41; Kearny v. Jeffries, 48 Miss. 343; Corbett v. Norcross, 35 N. H. 99; Jackson v. Nodle, 20 Johns. 184; Stephens v. Railroad, 20 Barb. 332; Foster v. Beardsley Co., 47 Barb. 505; Denton v. Perry, 5 Vt. 382.

LAMM, J.—Plaintiffs sue under Revised Statutes 1899, section 650, to determine and establish the estate, title and interest of plaintiffs and defendants, respectively, in certain real estate in Henry county, to-wit, the north half of the southwest quarter of section 24 (hereinafter called tract A), and the southwest quarter of the northeast quarter and the south half of the northwest quarter of the northeast quarter of section 27 (said parcels being hereinafter called tract B), all in township 42, range 27; and the south half of the northwest quarter of said section 24 (hereinafter called tract C).

The defendant Brown (hereinafter called George Brown) answered, alleging facts entitling him to affirmative equitable relief against his co-defendant

Goodwillie, if true, thereby changing the case into one strictly in equity.

From a decree in favor of plaintiffs and defendant George Brown, the defendant Ora M. Goodwillie appeals.

The paper case is this:

Plaintiffs say they own in fee simple tracts A and B, and as remaindermen own tract C, subject to the life estate of defendant Brown in tract C. The petition avers that Ora M. Goodwillie claims to own said real estate; that the defendant George Brown claims to own a life estate in tract C. At the institution of the suit Ella P. McCune, the mother of plaintiffs Nellie B., Alice L. and Julia H. McCune, was a defendant; but, she dying pending suit, her interest, if any, descended to her said children. It was averred that not only does defendant George Brown claim to own a life estate in tract C, but that he and Ella P. McCune claim some interest in the other land by virtue of the will of one J. Murray Brown (hereinafter called Murray Brown), their brother now deceased.

The allegations of the separate answer of George Brown may be summarized thus: That Dixon Brown died seized of a large tract of land in Henry county, Missouri, of which the land described in the petition was a part; that he died testate and his will was established and admitted to probate; that George Brown, Murray Brown, Ella P. McCune and Catherine Brown were brothers and sisters, and the children of Dixon Brown; that Catherine died in 1880, leaving a son, Frank B. Stafford (coplaintiff with the McCune heirs); that Murray Brown died in 1893, leaving the defendant Ora M. (since intermarried with Thomas B. Goodwillie) his widow; that, in accordance with the provisions of Dixon Brown's will, said George Brown, Ella P. McCune, Frank B. Stafford and Murray Brown, in the year 1886, divided the real estate described in the peti-

tion between them; that in pursuance of that division one Barr, as executor of Dixon Brown's will, was required by them to execute and deliver a deed to each for his or her respective share; that such deeds were executed and thereby defendant George Brown obtained tract C; that he and his wife, Emma, being childless, he, under the notion that his wife could hold the share allotted and conveyed to him for her natural life if he conveyed it to her through a conduit, made a conveyance of tract C to his brother Murray in September, 1892; that George and Murray Brown had talked over this plan prior to the execution of the deed. (It may as well be said here in explanation that it is affirmed on one side and seemingly denied on the other that the will of Dixon Brown devised to George only a life estate). The answer proceeds with the averment that George Brown never delivered this deed, but placed it on record in Henry county in January, 1893, and recovered possession of it from the recorder; that Murray Brown was sick and was never able to execute a deed to Emma, he dying in the summer of 1893; that there was no consideration for the deed from George to Murray and that George Brown has been in the full and undisputed possession of tract C from the date of said division deed; that Murray Brown owned an adjoining eighty acres (tract A) and there being an agreement to that effect between Murray and George, the said Murray rented the two tracts together until the time of his death, paying the taxes out of the rents and paying one-half of the remaining rents to George; that, after the death of Murray, George had the same running arrangement with his codefendant, Ora M., and they rented the land together through one Crissman; that Ora M. paid him one-half the rents up to the year 1901, and, until within the last six months, recognized his possession and ownership of tract C and part of tract B, and disclaimed all title and right thereto.

The answer then avers that George Brown is the owner of the above real estate; that Ora M. Goodwillie has no interest, right or title to the same, or right to possession thereof, and she never had possession thereof and a decree is prayed adjudging that she have no right, title or interest in said real estate, and for general relief.

The separate amended answer of Ora M. Goodwillie admits she claims to be the owner in fee of all the lands described in the petition, and denies every other allegation. Avers that she has been in the "actual, peaceable, open, notorious, continuous and exclusive possession" of all the lands described, under a claim of right thereto, adversely to the claim of plaintiffs and all other parties for more than ten years next before the commencement of this action.

To this answer the defendant Brown and plaintiffs filed their separate replies, denying all new matter.

The case made on the facts is substantially this:

Among other things it stood admitted that Murray Brown died on the 26th day of July, 1893, without issue, leaving the defendant Ora M. as his widow; that Dixon Brown died in the year 1879; and that he, Dixon, was the common source of title.

The defendant Ora M. Goodwillie formerly resided in Ohio, but at the time of this suit and for years prior thereto resided in Detroit, Michigan. Her codefendant, George Brown, and the plaintiffs are residents of the State of Ohio, where their ancestor Dixon Brown lived and died. On the 3d day of July, 1878, Dixon Brown conveyed five hundred and sixty acres of land in Henry county, Missouri, including tracts A, B and C, to his daughter Catherine, the mother of plaintiff Frank B. Stafford, which deed was spread of record in that county nine days later, and expressed a consideration of three thousand dollars. It seems he was then an old man and his daughter Catherine was his housekeeper.

Following that deed, and in October of that year, he conveyed to said Catherine certain real estate in Perry county, Ohio, for an expressed consideration of $4,333.33, and made transfers of personal property to her. We infer these conveyances and transfers to Catherine covered and conveyed away practically all his estate.

Prior to these conveyances to Catherine, to-wit, on February 28, 1878, Dixon Brown made a will and thereby disposed of his estate, nominating his daughter Catherine as executrix—the disposition of his real estate alone concerning us. After making some special bequests out of his personal property and bequeathing the residue thereof to his daughters Catherine and Ella P., and by item 5 devising to his daughter Catherine his residence in the town of Somerset, Perry county, Ohio, to be hers absolutely, items 6 and 7 are as follows:

"*Item 6th.* All the residue of my estate of which I shall be possessed at the time of my death whether real or personal of whatever kind and description not hereinbefore disposed of, I give, devise and bequeath *subject to the limitations and provisions hereinafter expressed* in equal proportions to my said four children, viz.: To said George W. Brown, John M. Brown, Catherine A. Brown and Ellen P. McCune, each of them to have one-fourth part thereof or of the proceeds arising from the same share and share alike.

"*Item 7th.* In regard however, to the several shares so given to my children as aforesaid I further provide and direct that in case either or any of them shall die, leaving no child or children surviving him, her or them respectively, the aforesaid legacies and shares so given by me to said deceased child or children, instead of being held by the wife, or wives, husband or husbands of such decedent or decedents, shall pass to and be held by my grandchildren that may be

then living in equal proportions share and share alike.''

Item 9 provided, among other things, for a sale of the devised real estate by the executrix and a distribution of the proceeds among the devisees *"subject, however, to the provisions and limitations expressed in the foregoing item thereof"* (See item 7); and continues as follows: "Providing that if a majority of my said children shall be of the opinion that it would be more to the advantage of my estate to have the sale of the whole or any part of my shares of stock or real estate delayed for a reasonable time with a view of obtaining a better price for the same then the sale of said property may be delayed, or if my said children can agree upon an amicable partition or division of my shares of stock and real estate, or any part thereof in the proportions and *subject to the directions and limitations I have hereinbefore provided for the distribution and disposal of my estate,* then such shares of stock and real estate may be so partitioned, or divided without being exposed to sale.''

Others items of the will provided for disinheriting any legatee contesting the will, etc. This will was duly probated in Ohio, recorded in Henry county, Missouri, and introduced in evidence by plaintiffs—the defendant Ora M. objecting because ''at the time of the execution of the same the testator was not the owner of the real estate in controversy.''

It seems that on the death of Dixon Brown one Barr was appointed administrator of his estate with the will annexed in Perry county, Ohio. Catherine died and Barr was also appointed her administrator. Thereupon a suit in equity was brought by Ella P. McCune in the court of common pleas of said county, against Frank B. Stafford, George and Murray Brown and Barr in his capacity as administrator of Dixon Brown and of Catherine. The object was to determine and adjudge that the deeds and transfers made by

Dixon Brown to his daughter, Catherine, subsequent to the execution of his will, were void.   To that end by apt narration it was alleged in the bill that Dixon Brown died testate (setting the will forth); that the deeds never were delivered; that Catherine got possession of them surreptitiously and placed them of record; that Dixon Brown was enfeebled in mind by age and disease and incapable of understanding or attending to ordinary business transactions and was under her controlling influence at the time of their execution; that she procured the signing and the sealing of the deeds by undue influence and threats; that no consideration was paid, etc.; and that Dixon Brown died seized of all said property and the said will was operative in its disposition.   Due service was had on the defendants and a guardian was appointed for the minor, Frank B. Stafford.   Issue was joined and presently a decree was entered finding the allegations of the petition to be true and that Frank B. Stafford, as the heir of his mother Catherine, ought to reconvey the Ohio and Missouri real estate upon reaching his majority; and adjudging and decreeing that said several deeds be set aside and  held for naught, and further, "that the said Frank B. Stafford immediately on reaching his majority reconvey all the interest in said real estate in Perry county, Ohio, and in the remaining unsold portion of land situate in Henry county, Missouri, which accrued to him by virtue of said deeds, to the devisees thereof under the last will and testament of said Dixon Brown, deceased, and that in default of such conveyance on his reaching majority this decree operate as such conveyance."

Matters connected with the suit required an accounting, accordingly a special master was appointed to hear evidence and take such accounting of rents and profits and repairs, etc.   Thereupon notice was

204 Sup—21

given of an appeal by the plaintiff because of the refusal of the court to charge Catherine with the value of thirty-seven thousand dollars of Furnace Company stock. The defendant George Brown was dissatisfied with the decree and gave notice of appeal; so, too, the defendant Barr, as administrator of Catherine, and the minor defendant, Frank B. Stafford, each gave notice of an appeal.

The record ends at this point and is duly authenticated as a full and true copy of the complete proceedings in said cause. To the admission of the foregoing record produced in evidence by the plaintiffs, the defendant Ora M. "objected for the reason that the said court of common pleas had no jurisdiction to enter a decree affecting real estate in Henry county, Missouri." This objection being overruled, exception was saved.

Introductory to the offer of the said record, plaintiffs produced a witness, R. C. McBeth, who testified that he had been a practicing lawyer in the State of Ohio; that he was familiar with the laws of that State and with the jurisdiction of its courts, and that the courts of common pleas there are courts of common law jurisdiction and have jurisdiction in all matters of equity. To the introduction of this testimony, defendant Ora M. "objected for the reason that it is not the best evidence of the jurisdiction of the courts, the printed statutes of said State being the best evidence;" which objection was overruled and an exception was saved.

It may be said in connection with the objection to the foregoing oral testimony of Judge McBeth that instructions were given at appellant's request. This being an equity proceeding, such instructions fill no material place, and the giving and refusing of them need not be looked into; but they may, nevertheless, indicate somewhat the trend of the chancellor's mind. One instruction given for appellant is as follows: "The

court declares the law to be that parol evidence is not admissible to prove the jurisdiction of a foreign court, unless it shall first appear to the court that the said foreign court is not a court created by statute or constitutional provision.'' There was no evidence forthcoming that the court of common pleas of Perry county was not created by statute or constitutional provision.

Following said suit in the Ohio court, to-wit, in 1886, it seems some sort of an agreement was entered into between the heirs of Dixon Brown, including Murray, the life of which was that they would abide the decree and allow the real estate to descend under the terms of Dixon Brown's will. This agreement is not here, but the substance of it was shown in depositions. Accordingly, there was a domestic distribution of the real estate in Missouri under the provision of item 9 of said will. At that time Frank B. Stafford was still a minor and his curator joined with George Brown and Murray Brown and Ella P. McCune in a written request to Barr, as administrator with the will annexed, to make deeds in accordance with the will, and an agreed division. Barr executed such deeds. He conveyed tract C to George Brown; he conveyed tract A to Murray Brown; and, as we understand the record, tract B (being timber land of little value and not in use) was unconveyed, while other tracts were conveyed to Stafford and to Mrs. McCune. One of these conveyances, the one to Murray Brown, may be taken as a sample of them all; and it was put into the case below by appellant. It narrates that Dixon Brown died in 1879, having made and executed in due form of law his last will and testament, and the date and probate of it are set forth; that Barr was appointed administrator *de bonis non* with the will annexed, the executor mentioned in the will having died; that Dixon Brown had conveyed to his daughter Catherine 560 acres of

land, a part of which is "hereinafter described." It then sets out with nice particularity the proceeding in equity in the common pleas court of Perry county, Ohio, between Mrs. McCune on the one side, and the other children of Dixon Brown and the administrator on the other. It recites the decree in that case holding for naught the deed to Catherine for the Henry county land. It refers to the power granted by item 9 of the will directing Dixon Brown's executor to sell his real estate, etc., and the provision allowing his children to make amicable division thereof. Reference is had to a certified copy of the will and the probate thereof, now on file in the offices of the probate judge and the recorder of deeds in Henry county. It narrates that the heirs at law had requested the administrator to convey to each of them specified parts of the Henry county land for the purpose of affecting a division thereof; that said request was in writing and requested that a specified eighty acres be deeded to Murray Brown (referred to as John M. Brown) and says that in pursuance of the written request and the power donated by the will the administrator conveys tract A to said Murray Brown.

Barr's deed as administrator to George Brown conveys tract C in accordance with the terms of the will. Both these deeds were presently placed on record, with the other deeds to the other heirs, and possession was taken by the grantees. Enough appears by the record to show that the minor, Frank B. Stafford, when he came of age, adopted his conveyance and this domestic partition by ratification, in that he sold the land conveyed to him.

By reference to the description of tracts A and C it will be seen that they were coterminous with each other, constituting one body of land. The two brothers, George and Murray, fell into the running arrangement of allowing Murray to look after George's land in con-

nection with his. Accordingly, for many years and up to Murray's death, tracts A and C were rented through one Crissman, a local agent. Crissman accounted to Murray, who was a man of business training and affairs, living in Columbus, Ohio, and then in Detroit, Michigan. Murray, on the other hand, faithfully accounted to George by letter, deducting taxes and repairs and dividing the rent in halves and keeping him informed about his interests and advising him in a fraternal way. All this appears by correspondence and stands uncontradicted.

When Murray Brown died in 1893 he left a will. It was admitted to probate, and appears in this record at the instance of defendant Ora M. By that will he devised all his property to her, for and during the term of her natural life, with power to sell his real estate and make use of such part of the proceeds as she desired, without having to account therefor. She had, furthermore, the power to give and devise the same as though she was the absolute owner. All property of every kind which might remain and might accrue to her by reason of investment or exchange or conversion and which remained unexpended and not devised and bequeathed under the power given her, descended, one-half to the heirs of his wife and one-half to his heirs, each to take as of the date of her decease.

George Brown testified in his own behalf by deposition. The bill of exceptions contains two accounts of what happened when his deposition was offered in evidence. They differ in verbiage and we shall select the latest recital in the bill as more probably inclusive of the settled convictions of appellant's learned counsel upon that occurrence. Here it is:

"Defendant Goodwillie objected to the deposition of George W. Brown, for the reason that its entire contents is immaterial and incompetent, irrelevant. De-

fendant especially objects to that portion of the testimony of said George W. Brown which details conversations and agreements had and made by and between George W. Brown and J. Murray Brown, for the reason that said J. Murray Brown is now dead, hence George Brown cannot now be heard to testify to any agreement or conversation had with the decedent, said George W. Brown being a party to such agreement. For the further reason, said testimony does not tend to prove or disprove any issue raised by the pleadings.

"Admitted subject to said objections and exceptions."

Subsequently, at the request of appellant, the chancellor announced the rule of law binding on him to be "that in a contest between a devisee and the testator's grantor of the land devised, the latter is not a competent witness as to transactions between himself and the deceased. And that all testimony in the deposition of George W. Brown in relation to or pertaining to any alleged conversations or transactions had between the said George W. Brown and J. Murray Brown, deceased, is incompetent and cannot be admitted as evidence in this case." Appellant thus obtained the ruling desired by her and in the form desired. In using the testimony of Brown we will confine ourselves to that part of his testimony relating to conversations and transactions with Ora M. personally since Murray's death and the probate of his will; and to new matter not testified to by him in chief, but brought out on cross-examination by appellant's counsel. This under a rule of law presently to be announced.

It appears therefrom that George Brown explained to defendant Ora M. after her husband's death how he came to make a deed to his brother, Murray, a few months before he died. He says the widow promised to

convey back to him. She denies this. The correspond-
ence shows the same renting arrangement existing be-
tween him and Murray Brown, continued on down to
and during 1899 or 1900 with Ora M., she stepping into
the shoes of her husband in that arrangement, and
the land continued to be rented through Crissman, and
the widow continued to account by letter for one-half
the rent of tracts A and C, less repairs and taxes. In
one of these letters she asks, "Do you wish me to col-
lect your money from Crissman with mine? It is due
the 4th of November [1893]. I will write about it
soon." In December, 1893, she speaks about "our
tenant," and that "we should have the [rent] money
now and if it should not come in in a day or so I
can lend you the amount." Again: "You probably
know more than I do about matters, I only know what
he [Crissman] writes me. I will write you again as
soon as I can send money." In another she says the
notes for the rent of the land are due December 1,
1894, and March 1, 1895. She then refers to a con-
templated sale by George Brown of his interest in the
timber land. Again she writes to disabuse the minds
of George Brown and his wife of any notion that she
was displeased with George; and continuing, said: "In
regard to the money from Missouri, the man [the
tenant] is hard up and cannot raise it for a few weeks
but it is sure and if you have to have money before
it comes I can let you have it until that time. The farm
is rented to the same party for next year." Again, on
June 5, 1894, she encloses a draft for $67; and she
excuses the amount by saying that the tax was not
paid last year, explains about some repairs that had
been made and speaks about Crissman's expenses for
his trouble and that the other rent money would come
in time. On August 1, 1894, she refers to the fact
that Mrs. McCune and Frank Stafford had sold their

western land, and that George Brown could sell his timber land at six dollars per acre. In another letter she speaks of having written Crissman and sent the rent note for collection; that it would be due next Tuesday, and added: "I, too, hope it will be paid, though I will only get a few dollars out of my half." She speaks of writing a letter to Crissman in which she said that George Brown and she were in urgent need of money. In another she encloses a draft, writing these words: "Enclosed you will find a draft for your share of the farm money after deducting the expense incurred. The rent note was $158 and $1.55 interest." She then deducts the Henry county tax, the cost of 207 pounds of wire and the pay of Crissman, a total of $46.71, and sends the balance of $56.42. After explaining expenses paid out, she says: "That the year before there was nothing spent on the farm for repairs and that if Mr. Murphy, the tenant, did not rent it, we might have it stand idle for a year." Again she says, referring to the outlying piece of land belonging to George: "You know this piece of land has nothing to do with the farm you rent to Mr. Murphy. [Murphy was tenant of tracts A and C.] I have not heard but suppose he will keep the farm for another year. I have written him about it. When I hear from Crissman I will send the letter to you. Our rent money is due next Monday." Again, she acknowledges receiving a draft from Crissman for a half year's rent, which she says she will send on to George in a couple of days, and that she writes so that if anything happens to her "you can show this for your $72.20 that I have of your money." And so the correspondence continued, year in and year out, sending rent money in some letters, excusing the delays in others and in still others reporting a failure of crops and a failure to collect the rent, explaining the expense in attending to the busi-

ness in Missouri, etc. In one letter she mentions her contemplated acuteness in demanding by letter an itemized account from Crissman, and says: "I will blame it on George, will say I will have to show it to George so he will know how the money is spent and what for." She asks receipts from George for his half of the rent. In 1897, in excusing the absence of rent, she explains that Crissman was obliged to take crop rent and the crop was a failure, and says: "The blame place is a nuisance and has been for two years. Crissman has tired of caring for the place and I don't think he takes the interest in it he did." And, in proof, she forwards Crissman's letters to be read. At this time she had become Mrs. Goodwillie, and she says her husband has done all that can be done but that all they hear is that "the land needs rest and is worn out and nothing can be raised on it." Again, she writes: "I have not received them [the notes for rent] yet, or the rent either, . . . I will send you your interest just as soon as I get it." Again, she explains her failure to get the rent money from Crissman, and says: "As a last resort Mr. Goodwillie wrote him, telling him that I requested him to force the parties to pay. That Mr. Brown wanted his money and must have it. I enclose you the reply. You can see for yourself we will get it as soon as possible and you will get your part immediately." Finally, the rent notes had to be sued on and this was explained and Crissman's letters forwarded. In 1899 Mr. Goodwillie represented his wife, at her request, and took up the thread of correspondence, informing Mr. Brown that only forty acres of the land was rented, and that he, Goodwillie, found out that the property was in bad shape, run down, buildings out of repair, etc. Again, he accounts as follows:

"Detroit, Mich., January 17th, 1899.

"George W. Brown,

"Somerset, Perry County, Ohio.

"Dear Sir: Mrs. Goodwillie asked me to write and send you the balance of the rent for the Mo. farm which is as follows:

| "Year's rent of farm | | $316.00 | |
|---|---|---|---|
| Taxes | $30.00 | | |
| Expenses | 20.00 | 50.00 | |
| | | $266.00 | |
| One-half of above | | | $133.00 |
| Amount sent you Dec. 6th, '98 | | | 50.00 |
| Enclosed check for | | | 83.00 |

"We have not been able to collect the balance of last year's rent and think it doubtful about getting it.

"Yours truly."

"Detroit, Mich., Dec. 23, 1899.

"George W. Brown,

"Somerset, Ohio.

"Dear Sir: Enclosed please find check for $24.74, being rent of Mo. farm as follows:

| One-third of crops as per Mr. Crissman's statement | $79.94 |
|---|---|
| Taxes for 1899 | 30.46 |
| One-half of $49.48 | |
| $24.74 | |

"We enclose Mr. Crissman's letters and statement, which you will please return.

"Yours truly,

"T. B. GOODWILLIE."

The significance of the last two letters will appear when it is pointed out that the taxes for the years 1898 and 1899 are deducted from the rent as if paid.

In April, 1900, Mrs. Goodwillie, through counsel, by letter directed a tax suit brought on tracts A, B and

C, and gave as the parties to be sued George W. Brown, Emma Brown, Ella P. McCune, Frank B. Stafford and Ora M. Goodwillie. To the September term, 1900, of the circuit court of Henry county, such suit was instituted for *State and county taxes of the years 1898 and 1899,* and defendants summoned by publication. At that term a judgment was rendered against all said parties, execution issued returnable at the January term, 1901, and a sale was made—the defendant Ora M. Goodwillie becoming the purchaser and receiving a sheriff's deed. This deed she put in evidence to establish title in her and one branch of her defense. She supplemented the foregoing record evidence by her deposition in which she testified that she collected the rents on the Missouri land and paid to George Brown a part thereof. She puts these payments on the ground that he was wanting money continually and that her first husband allowed him part of the rents (to use her own words) "so as to put a limit on the amount he might expect, and I continued to do so for some time after my husband's death. I did not do it because he was legally entitled to it, but simply because my husband helped him and I thought it right to continue the help." She denied having the conversations with him that he testified to. In effect, she testified that her husband held possession as owner of the land through tenants obtained by Crissman, and that she after his death held possession in the same way.

Appellant put Crissman upon the stand who testified that he had been in control of the land for fifteen or sixteen years as the agent of Murray Brown, and, since his death, of Mrs. Goodwillie; that he had accounted to Murray Brown in his lifetime and to his widow after his death and made some repairs with rent money; that this possession could be observed by any one in the neighborhood and had been continuous. She put one Murphy on the stand who testified he was

now in possession of the land as her tenant and under the supervision of Crissman.

Such is the case on the facts.

I. Appellant assigns as reversible error the admission of her codefendant's testimony covering conversations between him and Murray Brown, deceased, which conversations were offered to establish the averments of the answer that the deed from George to Murray was for the purpose of using Murray as a mere conduit in conveying George's title to his wife, Emma. It will be seen that the chancellor was of the opinion that such testimony was incompetent; and he so ruled, and we think rightly so in so far as there was any issue on that deed. But the cause of action on trial was not alone the contract and deed between Murray and George Brown. The issues took on other forms. The widow was standing not alone on that deed, but on a tax title and on adverse possession. Whether her tax title was good and her possession adverse were material issues in the case, and such issues were between live parties. Some of the testimony of the witness and his identification of letters also was material to those issues.

Respondents insist that appellant waived the incompetency of George Brown as a witness when her attorneys cross-examined him on new lines and on new matter not brought out in his examination in chief. It is the rule in some jurisdictions that when a cross-examiner examines a witness on new matter he makes such witness thenceforward, in very fact, his own. Such seems not the orthodox rule in Missouri. But a sequence of that rule has been adopted and applied by this court as a sensible rule in the administration of justice, to-wit: If a witness be incompetent and if the party insisting on his incompetency nevertheless examines him on new matter not touched or brought out in chief, then, as to such new matter, his

incompetency is waived. [Edwards v. Latimer, 183 Mo. 1. c. 627, *et seq.;* Ayers v. Railroad, 190 Mo. 1. c. 236; Johnston v. Johnston, 173 Mo. 1. c. 120, *et seq.;* Hume v. Hopkins, 140 Mo. 65; Miller v. Miller's Admr., 92 Va. 510; Banking House v. Rood, 132 Mo. 1. c. 264.] Effect will be given this rule in allowing weight to the testimony of George Brown.

II. Appellant's counsel assign reversible error in the admission of the exemplification of the record of the Ohio court. They argue: (a) That the decree entered in that court was not final, but interlocutory; and (b) that the record shows it was appealed from; furthermore, (c) that there was no evidence the court of common pleas of Perry county, Ohio, had equity jurisdiction. Of these in order.

(a) True the exemplification of the record shows the appointment of a special master in chancery to take an accounting followed the decree, and, by rigid right, a final decree would follow his report. But the objection now under consideration was not made below; and if not made there, it cannot be made here. [R. S. 1899, sec. 864.] In the lower court the only objection was that the court of common pleas of Perry county "had no jurisdiction to enter a decree affecting real estate in Henry county, Missouri." It cannot be said the objection under review is within the purview of that made, *nisi.*

But objection or no objection, the case is in equity, and if the decree entered by the chancellor depended solely on the Ohio decree, and if the latter was merely interlocutory in effect, we would be face to face with a serious question. But 'tis not so. As will presently be seen, the parties to the Ohio suit having taken part in a domestic distribution and having recited in their partition deeds the Ohio decree, they and their privies are estopped to deny the finality and conclusiveness of that decree. Having accepted the decree as final and

enjoyed benefits under it, they may not spurn the ladder on which they climbed or disown the cup out of which they drank. The point in hand is ruled against appellant.

(b)   The same disposition must be made of the objection that the Ohio decree was appealed from. The record does not so show. What it does show is that some of the parties litigant "gave notice of appeal." What that may mean under the Ohio practice, we do not know. The language falls short of showing an appeal was taken; and unless the phrase, "gave notice of appeal," is given a technical significance by the statute laws of that State, it cannot be held to have such a large play in meaning as to be equivalent to an order granting an appeal. Whatever it means, the point now made was not made, *nisi,* and, therefore, not made at all. So, too, as said, all parties here who were parties to the Ohio suit, or in privity with them, are bound by the recitals in the partition deeds relating to the finality of the decree.

(c)   But appellant contends, in substance, there is no   evidence that the court of common pleas of Perry county, Ohio, had equity jurisdiction. Let us see about that. At the trial Judge R. C. McBeth, a   practicing lawyer of the Henry Bar, learned in the laws of Ohio and familiar with the jurisdiction of Ohio courts, testified in effect that said court of common pleas had jurisdiction in matters in equity. Subsequently, at appellant's request, the chancellor held such evidence incompetent. Presumably, therefore, he allowed it no probative force; and we need not enter into an exposition of nice questions relating to the nature of the proof demanded in establishing the existence   of foreign laws and marking out an orbit to the jurisdiction of foreign courts; because, assuming McBeth's testimony was shut out of the case, yet it was prefatory in quality and merely led up to the record itself. Hence, the live

question is: What was the objection made below to that record, and what was the ruling of the court on that objection? The bill of exceptions shows that when the Ohio record was offered appellant's counsel challenged it thus: "To the admission of which the defendant then and there objected, for the reason that said court of common pleas has no jurisdiction to enter a decree affecting real estate in Henry county, Missouri." And that objection was overruled. What was in the minds of the learned counsel, we may not know; but what is written is written, hence we may know what was said. Attending to that, it ought not to be held that the foregoing objection challenged the equity jurisdiction of the court of common pleas of Perry county, Ohio. To the contrary, by implication the jurisdiction of that court to enter a decree is confessed. The objection assumes so much. The life of its challenge was that such court had no jurisdiction to enter a decree *affecting Missouri real estate*, and its force is so spent. What was this but to challenge the legal effect of the decree—its extra-territorial operation—and not to challenge the general equity jurisdiction of the court entering it? In fact, appellant elsewhere in her brief makes the point that the decree was not operative in this State and that phase of the case will receive attention presently. We are persuaded the assignment of error under consideration is without substance and the point is ruled against appellant.

III. Dixon Brown's lands in Missouri were conveyed by him to his daughter Catherine, the mother of Frank B. Stafford. She dying intestate, without other issue, Stafford took the land by descent cast, provided his mother's deed remained operative. If that deed be canceled and held for naught under the Ohio decree, then the devolution of the estate was through the will of Dixon Brown. If the Missouri lands passed under Dixon Brown's will, then the devisees under that will

accepting grants thereunder held under its provisions, and not otherwise. Hence a main question is: Are Dixon Brown's heirs and devisees bound by that decree canceling the deed, taken in connection with domestic partition and the deeds in consummation thereof, executed by Barr, administrator with the will annexed, under item 9 of Dixon Brown's will? The answer to that question is that said heirs and devisees and all those in privity with them are estopped by the decree. They had their day in a court of equity having jurisdiction of their persons. It had jurisdiction of the subject-matter, and could bind and did bind the conscience of every party to that suit. While the decree could not directly affect the bare legal title to land in Missouri, yet it could and did conclude all parties on every issue in that case; it could and did bind the conscience of Frank B. Stafford to reconvey when he attained his majority. Not only so, but the heirs and devisees of Dixon Brown were twice bound. By making a domestic partition among themselves based on that decree and based on the will of Dixon Brown, and accepting deeds in severalty, they again estopped themselves and their privies upon the plainest principles of equity by the recitals in those deeds. If it be said that Stafford was a minor and was not bound by those conveyances, yet such contention is without avail because he purged his conscience by adopting and ratifying the partition conveyances when he attained his majority and thereby became bound. [Shaffer v. Detie, 191 Mo. l. c. 389.] The inequity of allowing those deeds to be repudiated at this late day is seen at a glance when it is recalled that, under the deed from his grandfather to his mother, Stafford took all the lands in Missouri, while under the Ohio decree and the partition deeds in affirmance thereof he lost three-fourths of it. Murray Brown got eighty acres of land by virtue of that adjustment and his widow, in

privity with him, is estopped to claim that Stafford got title to tracts A, B and C under his grandfather's deed and lost it to Murray Brown and to her under the Statute of Limitations. If limitation be available to the widow, it must stand on a stouter foot than that. We consider the propositions announced in this paragraph elementary. They are abundantly sustained *seriatim* by cases collated and cited by learned counsel, samples of which are: Edwards v. Latimer, 183 Mo. 1. c. 626; Olney v. Eaton, 66 Mo. 563; Austin v. Loring, 63 Mo. 19; State *ex rel.* v. Zachritz, 166 Mo. 1. c. 313; Coney v. Laird, 153 Mo. 408; Penn v. Hayward, 14 Oh. St. 302; Burnley v. Stevenson, 24 Oh. St. 474; Fox v. Windes, 127 Mo. 502; see, also Herm. on Estop., sec. 603; *ibid,* sec. 630; 11 Am. and Eng. Ency. (2 Ed.), 167, *et seq.,* and cases cited.]

IV. Attending to the will of Dixon Brown, it will be seen that the title to tracts A, B and C passed to the devisees "subject to the limitations and provisions" expressed therein. There was no devise of an absolute fee simple estate at the outset to the several donees with a subsequent and ineffectual attempt to cut it down to a less estate by *ambiguous words inferential in their intent.* To the contrary, the limitation on the devised estate is stamped at its inception in the will and runs with unmistakable precision and persistency through the entire instrument by apt reference. In construing a will the pole star of interpretation is the intent of the testator. [R. S. 1899, sec. 4650; Grace v. Perry, 197 Mo. 550.] Construing this will by its four corners, it will be seen that devisees dying without a child or children took an estate determinable by that event. The contingency determining the estate happened in the case of Murray Brown and may happen with George Brown. [See items 6, 7, and 9 of the will.] We have been so lately over this question in Gan-

non v. Albright, 183 Mo. 238; Gannon v. Pauk, *Ibid,* 265; and Gannon v. Pauk, 200 Mo. 75, that an extended consideration is out of place; and we announce our conclusion to be that the estate of any devisee under the Dixon Brown will passed to his then living grandchildren on the death of such devisee leaving no child or children surviving him, and did not pass "to the wife or wives, husband or husbands of such decedent or decedents."

V. The decree set aside the quitclaim deed conveying tract C from George Brown to Murray Brown, dated in 1892, and recorded in January, 1893. Appellant assigns error on that score. The deed was for a small expressed consideration. Conceding that the testimony of George Brown was incompetent to show no delivery of the deed and no consideration therefor and to show that it was but the mere fragment of an unexecuted plan to transfer his title to his wife Emma, yet the correspondence and the course of dealing between the two brothers and between George and the widow of Murray Brown for many years all tend to show there was no delivery of the deed and that no reliance was placed on it as a muniment of title. To constitute a good delivery a deed must not only pass from the actual and constructive control of the grantor, but the grantee must accept the deed. The recording of a deed may be presumptive evidence of delivery, and, being for the grantee's benefit, may be presumptive evidence of acceptance, but it is a rebuttable and not a conclusive presumption in each instance. The decree was well enough in this particular. [Mudd v. Dillon, 166 Mo. l. c. 118-119; Huey v. Huey, 65 Mo. l. c. 694, *et seq.;* Cravens v. Rossiter, 116 Mo. 338; Sullivan v. Eddy, 154 Ill. 199; Alexander v. DeKermel, 81 Ky. 345; Metcalfe v. Brandon, 60 Miss. 685.]

VI. Appellant, failing in other contentions, asserts a title in herself: first, by tax proceedings and

sheriff's deed; and, second, by adverse possession. Is there merit in either of these defenses? Eminently no. Because:

(a)   Lying at the foundation of a claim of title by limitation is the one all-controlling fact that the possession relied on must be adverse—that is, hostile, and continuously so for ten years.   The possession from end to end in warp and woof must be hostile—begin hostile and continue hostile.   And this is so because the law presumes every possession is consistent with the true title and ownership.   [Alexander v. Polk, 39 Miss. 1. c. 755.]   Now, up to the date of his death, the possession of Murray Brown was friendy to George Brown as to tract C and to George's interest in tract B.   He acted as agent for, and in fiduciary relation with, George.   So, too, Murray Brown's possession as to tract A and the other interests in tract B under this record was presumably in subordination to the true title and the terms of Dixon Brown's will.   All the evidence points to the fact that the widow of Murray Brown stepped into her husband's shoes and possession; and there is nothing in the case to show that at the beginning she held otherwise than in subordination to the true title.   A possession commencing friendly or in subordination to the true title does not change into a hostile one by a mere change in mental attitude, but continues to run with the true title.   If a claimant desires to plant himself under the folds of the flag of hostile possession, so as to make the Statute of Limitations begin to run, he must run up his flag and bring notice home to all concerned by open acts, unequivocal in character, of adverse possession and that he holds against all comers by claims and conduct equivalent to ouster or disseizin.   [Coberly v. Coberly, 189 Mo. 1. c. 16, *et seq.*, and cases cited; Stevenson v. Black, 168 Mo. 549; Hunnewell v. Adams, 153 Mo. 440; Johnson v. Prewitt, 32 Mo. 553; Baber v. Henderson, 156 Mo.

566; Rothwell v. Jamison, 147 Mo. 601; Comstock v. Eastwood, 108 Mo. 41; Heckescher v. Cooper, 203 Mo. 278.]

Hostile possession in the case at bar began within ten years prior to this suit as to the respondents and not sooner than 1900 as to George Brown. It never reached a statutory age and growth creating a title in appellant, but was nipped in the bud by the suit at bar and died in the bud—nothing in its short life so becoming it as its taking off.

(b)    Nor, in equity, can her tax suit and sheriff's deed avail appellant. The duty rested on her to pay these taxes. She was in possession, gathering the rents. She took credit in her accounting with George Brown for the taxes on tract C and his part of tract B for the very years (1898 and 1899) on which the judgment was obtained. Her husband's will made her a life tenant in all his estate, with power of disposition. Presumably (at the beginning) under an innocent mistake as to the character of her husband's title in his Missouri lands, she entered upon those lands in 1893, thinking she was a life tenant. On her own theory of the case, as said, the duty rested upon her to pay taxes; for even those without the law, must be a law unto themselves. Finally, with the rent money in her pocket, she conceived a plan to cut off the remaindermen and divest the title she held in subordination. To that end she purposely created a default in payment of the taxes. To that end the tax suit was brought by her request, and she took her sheriff's deed as a consummation of her covinous scheme. The question is: Did she attain her end? Does the law crown such conduct with success? It seems to me it would be putting a sword in the very bones of equity, to borrow the animated metaphor of the Psalmist, to answer those questions in the affirmative. And so it is written in the books. The rule is that the purchase at a tax sale

by one upon whom rests the duty of paying the taxes operates merely as a payment of such taxes, leaving the title to stand as if the payment had been made before sale. [27 Am. and Eng. Ency Law (2 Ed.), 954; Bone v. Tyrrell, 113 Mo. 175; Frank v. Caruthers, 108 Mo. 569; Childers v. Schantz, 120 Mo. 305, and cases cited; Black on Tax Titles (2 Ed.), secs. 289, 290.]

Under the Dixon Brown will Ella P. McCune was not a remainderman in tracts A, B and C. The grandchildren of Dixon Brown were remaindermen, who are (so far as known) the children of Ella P. McCune, and Frank B. Stafford. The McCune children were not made parties to the tax proceedings, and on no theory of the law could the tax deed affect them.

From any point of view the decree is right. Therefore, it is affirmed.

All concur except *Graves, J.,* who did not sit.